UNITED STATES of America, Appellee,

v.

Harrison A. WILLIAMS, Jr. and Alexander Feinberg, Defendants-Appellants.

Nos. 168, 424, Dockets 82–1111, 82–1123.

United States Court of Appeals,
Second Circuit.

Argued Oct. 7, 1982.
Decided April 5, 1983.

**606**

Edward R. Korman, U.S. Atty., Brooklyn, N.Y. (Edward A. McDonald, Atty.-in-Charge, Organized Crime Strike Force, Lawrence H. Sharf, Sp. Atty., and Gregory J. Wallance, Asst. U.S. Atty., Brooklyn, N.Y., on brief), for appellee.

Erwin N. Griswold, Washington, D.C., and George J. Koelzer, New York City (Claire L. Shapiro and Jones, Day, Reavis & Pogue, Washington, D.C., and Joel N. Kreizman, John P. Croake, and Evans, Koelzer, Marriott, Osborne & Kreizman, New York City, on briefs), for defendant-appellant Williams.

Carol Prendergast, New York City (Harry C. Batchelder, Jr., Susan D. Bauer, Glenn Bogdonoff, and Shelly R. Rossoff, New York City, on brief), for defendant-appellant Feinberg.

Before FRIENDLY, NEWMAN and KEARSE, Circuit Judges.

NEWMAN, Circuit Judge:

Harrison A. Williams, Jr., formerly United States Senator from New Jersey, and Alexander Feinberg, an attorney and close friend of Williams, appeal from judgments of conviction entered in the District Court for the Eastern District of New York (George C. Pratt, Judge) after a jury trial on bribery and related charges arising out of the Abscam undercover "sting" operation. We have previously explored the factual background of Abscam and many of the legal issues arising from this controversial undertaking in upholding the sufficiency of the indictments against four Congressmen and three of their associates, *United States v. Myers,* 635 F.2d 932 (2d Cir.) (*Myers I*), cert. denied, 449 U.S. 956,

101 S.Ct. 364, 66 L.Ed.2d 221 (1980); *United States v. Murphy,* 642 F.2d 699 (2d Cir. 1980), and in affirming their convictions, *United States v. Myers,* 692 F.2d 823 (2d Cir.1982) (*Myers II*), petitions for cert. filed, 51 U.S.L.W. 3554, 3555, 3567 (U.S. Jan. 14, 17, 1983) (Nos. 82–1183, –1199, –1255). The evidence against Williams and Feinberg differs in significant respects from that presented in previous Abscam trials, but the major legal issues are similar. In light of our holdings in *Myers I* and *Myers II* and for the more particular reasons detailed in this opinion, we affirm the judgments of conviction.

I.

Williams and Feinberg were charged in a nine-count indictment, along with co-defendants Angelo J. Errichetti, formerly Mayor of Camden, New Jersey, and George Katz, a New Jersey businessman.[1] Errichetti was severed after his conviction in the *Myers* trial, and Katz was severed for health reasons and has since died. The indictment alleged a conspiracy and eight substantive violations, arising out of Williams' conduct, aided and abetted by Feinberg, in promising to use his position as a United States Senator to help obtain government contracts for the purchase of titanium from a mining venture in which the defendants held an interest. The promises were alleged to have been made in connection with two transactions, the first, a proposed loan of $100 million ostensibly to have been financed by a fictitious entity known as Abdul Enterprises, Ltd. This entity, purporting to be an enterprise of two wealthy Arab sheiks, was the cover of an elaborate "sting" operation conducted by agents of the Federal Bureau of Investigation. *See Myers II, supra,* 692 F.2d at 829–30. The second transaction, also proposed by the Abscam operatives, involved a second Arab group's offer to purchase the mining venture for a sum that would have yielded all the owners of the venture an

---

1. We have previously rejected pretrial challenges to the indictment. *United States v. Williams,* 644 F.2d 950 (2d Cir.1981).

estimated $70 million profit. For each transaction the indictment charged four offenses: bribery, in violation of 18 U.S.C. § 201(c) (1976) (Counts Two and Six); receipt of an unlawful gratuity, in violation of 18 U.S.C. § 201(g) (Counts Three and Seven); conflict of interest, in violation of 18 U.S.C. § 203(a) (Counts Four and Eight); and interstate travel to carry on the unlawful activity of bribery, in violation of 18 U.S.C. § 1952 (Counts Five and Nine).[2] Count One charged a conspiracy to defraud the United States and to commit the substantive bribery, unlawful gratuity, and conflict-of-interest offenses, in violation of 18 U.S.C. § 371.

A jury trial began on March 30, 1981, and concluded on May 1, 1981. The jury found both defendants guilty on all nine counts. From June 22 to June 25, 1981, the District Court conducted a "due process" hearing to assess various post-trial claims, including the defendants' basic contention that the Government's conduct of the Abscam investigation exceeded the standard of fairness mandated by the Due Process Clause of the Fifth Amendment. On December 22, 1981, Judge Pratt issued a comprehensive opinion rejecting all of the defendants' claims, except Feinberg's motion for judgment of acquittal on Count Five for insufficiency of the evidence, which was granted. *United States v. Williams,* 529 F.Supp. 1085 (E.D. N.Y.1981). Thereafter Judge Pratt sentenced Williams to three years' imprisonment and fines totalling $50,000; Feinberg received a sentence of three years' imprisonment and fines totalling $40,000.

## II.

The Government's evidence against Williams and Feinberg revealed transactions more elaborate than those of the Congressmen in *Myers* who accepted $50,000 in cash in exchange for their promises to help secure private immigration legislation. Despite the complexity and higher stakes, however, the essentials of the criminal conduct in this case remained straightforward: a public official's seeking monetary benefit in exchange for his promise to use his official position.

The background events were recounted by Henry A. ("Sandy") Williams, III, a friend and business associate of Senator Williams but not a relative, who testified for the Government after receiving a grant of immunity. In 1975 Sandy Williams became aware of a mining property in Piney River, Virginia. The property was initially thought to be rich in phosphorus and, later, in titanium. Sandy Williams acquired an option on the property for Penque Williams, Inc., a corporation owned equally by him and an associate. Upon acquiring the option in 1975, Sandy Williams discussed the property with Senator Williams and told him that considerable help would be needed to get the venture started. The Senator assured Sandy Williams that he would "give us all the help that he could possibly give us" and, as Sandy Williams further testified, "for that we agreed that he would get one half of my interest in Penque Williams, Inc." In 1976 Sandy Williams obtained enough financing to exercise the option on the Piney River property and formed a new corporation, United States Titanium Corporation, to take title to the property. Sandy Williams held a 28⅓% interest in the new corporation, and on March 23, he executed a document acknowledging that half of his interest (approximately 14%) was owned by the Senator. The Senator retained the document in his Senate office files.[3] For three

---

**2.** Counts Two through Four alleged that Senator Williams sought and agreed to receive a loan of money for a business enterprise in which he had an interest and sought and agreed to receive shares of stock in the enterprise. Count Five referred only to the shares of stock. Counts Six through Nine alleged that Senator Williams sought and agreed to receive a sum of money as proceeds from the sale of the enterprise.

**3.** At trial the Senator sought to dispel the significance of the 1976 document. Though the point is irrelevant in view of the Senator's 1979 receipt of stock certificates evidencing his share of the venture, we note that in a recorded conversation on September 11, 1979, when the tax consequences of a sale of the venture were discussed, the Senator stated, "We can put our investment back to the beginning of Piney Riv-

years nothing happened, since the mining venture lacked the necessary capital, estimated by Sandy Williams to be $13 million. Enter Abdul Enterprises, Ltd., the fictitious entity created by the Federal Bureau of Investigation as a source of funds ostensibly supplied by two Arab sheiks looking for investment opportunities.

*The Loan Transaction*

As the *Myers* case reveals, one of the first politicians to become interested in the prospect of obtaining money from Abdul Enterprises was Angelo Errichetti, then the Mayor of Camden, New Jersey, and a member of the New Jersey Senate. In January 1979, Errichetti mentioned to his friend Senator Williams that he had established contact with wealthy Arab investors. Williams' reaction was to tell his long-time friend and associate, attorney Alexander Feinberg, to contact Errichetti and "see what the hell's going on." By this time Feinberg had acquired a percentage of the mining venture in return for his looking after the Senator's interests and helping to make presentations to potential investors. Feinberg, Errichetti, and Sandy Williams met with an FBI agent and an FBI informant, Melvin Weinberg, both posing as representatives of one of the sheiks. Feinberg stated that Senator Williams was interested in the mining project and was anxious to have it funded. He also made it clear that the Senator had an undisclosed interest in the venture, which he said was half of Feinberg's share. As Errichetti described the relationship to the sheik's representatives, Feinberg was the Senator's "bagman." Sandy Williams said that $13 million was needed to get the mining venture into operation. In early March, Sandy Williams suggested to the sheik's representatives that Abdul Enterprises loan an additional $70 million to finance the purchase of a titanium dioxide plant owned by the American Cyanamid Company. He estimated the total financing needs were $100 million.

On March 21, 1979, Sandy Williams discussed with the Senator a meeting the Senator was scheduled to have with the sheik two days later on board a yacht in Florida. Sandy Williams testified that he told the Senator, "Pete [the Senator's nickname], this is an important meeting," to which the Senator replied, "Sandy, look, I will do everything possible to get that money." At a party aboard the yacht on March 23, the Senator met the sheik and told one of the sheik's representatives that he was interested in having the mine funded and would "assist [the representative] in any way possible in getting this project going." The next day Errichetti reported to the sheiks' representatives how impressed the Senator had been and that he "can be of service to you in Washington or wherever. This is Government stuff, now."

The opportunity for such service appears to have initially come to the attention of Sandy Williams and George Katz, another friend of the Senator's and also a participant in the mining venture, as a result of newspaper articles in late May outlining the need for titanium for national defense, especially its use in submarines. Katz telephoned Weinberg, read him one of the articles, and estimated that the venture could market forty thousand tons a year "[i]f you go into a titanium metal which the United States is short of." In discussing the articles with Sandy Williams, Katz raised the prospect of the Senator's helping to secure government contracts for titanium. Sandy Williams testified that Katz told him, "Sandy, this deal, if it was going to be made, the senator is going to have to exert himself, is going to have to try to get the government contracts for this project." Sandy Williams responded that the Senator could not get government contracts for the project because, as he understood it, contracts in excess of $25,000 were awarded strictly on the basis of competitive bidding. Sandy Williams further testified that later that same day Katz told him competitive bidding was not required:

> He said, you are all wrong about bidding on a government contract. You can negotiate, he said, a contract with the

er for the capital gains," a date Sandy Williams reminded the Senator was 1976.

government, if it is a scarce item, if it is an item the government needs, you don't have to bid on it.

And I didn't argue with him because George was in the garbage business in New Jersey and he was dealing in government contracts and I took what he said to be true.

On May 30, Weinberg asked Feinberg in a recorded conversation whether the Senator can "do something on getting us the contracts." Feinberg replied, "We can try." The next day the sheik's representatives held a luncheon meeting with the Senator at the Pierre Hotel in New York City. Just before the luncheon, Feinberg told Weinberg in a recorded conversation,

> On the contracts, I can tell you now that he will open up the doors for us. And use his, you know what I'm talking about, to get the contracts.

Moments later Feinberg met with Weinberg and F.B.I. agent Anthony Amoroso, one of the principal undercover operatives. Their recorded conversation included the following:

> Amoroso: Is [the Senator] going to be able to steer any kind of contracts from the Committees that he's on toward, toward the operation that we're going to get involved with? I mean [—]
>
> Feinberg: Well this I didn't know until now I have to ask him that.
>
> Amoroso: Yeah.
>
> Feinberg: I would assume, I know that he's often opened up many doors. You understand what I'm talking about, and with his blessing [—]

Also prior to the luncheon, the Senator met with Feinberg and Sandy Williams. At this meeting, according to the testimony of

Sandy Williams, Feinberg told the Senator, "Pete, the important thing [a]bout this meeting is going to be your help in getting government contracts," and the Senator replied, "I understand."

At the luncheon meeting, when, the Government contends, the subject of getting government contracts arose, the Senator stated, "I can't say yes or no, sure try." The audio tape of this meeting is inaudible as to the conversation preceding the Senator's remark, but other evidence abundantly permitted the jury to conclude that the Senator was referring to his role in obtaining government contracts. First, the conversations just prior to the luncheon indicate that the Senator understood his role. Second, Amoroso, who attended the luncheon, testified that the Senator's willingness to "try" was expressed in response to a statement that the Senator's aid in obtaining government contracts was one of the reasons for the loan. Third, after the meeting, both Feinberg and Sandy Williams reminded the sheik's representatives that the Senator had said he would try to get government contracts.[4]

With the Senator and his cohort having expressed an eagerness to receive from Abdul Enterprises loans totaling nearly $100 million, the Senator met with the sheik on June 28 to persuade him that the Senator's influence justified making the loans. The videotaped conversation reveals Williams discussing at length his ability to be influential with the Government as a result of his senior position in the Senate. In addition to mentioning his close relationship with the Vice-President ("used to work for me, on the committee") and the Secretary of State ("a neighbor back in New Jersey . . . we're very close"), the Senator assured the sheik:

---

4. A taped telephone conversation on June 8 included this exchange between Feinberg and Weinberg:

> Weinberg: All Yassir [the sheik] wants to know is that he's gonna get contracts.
> Feinberg: Well he can't gu—he's gonna help us, he's already said that.
> . . . .
> You heard him say it, didn't you?
> . . . .
> Weinberg: Yeah, I heard him say it.

Both Feinberg and Weinberg had attended the May 31 luncheon.

At a June 15 meeting, also recorded, this exchange occurred:

> Feinberg: I talked to the Senator before in New York. I said these people and everybody understands that you have to help us get these contracts. He said of course I will. Isn't that right?
> Sandy Williams: Definitely, I was right there.

I only involve myself in something that I, I just completely believe in and this one, this whole situation we've presented through the mine, the processing and the product. I believe it, you know. With . . . great pleasure talk to the President of the United States about it and, you know, in a personal way and get him as enthusiastic and excited because we know what our country needs.

Government contracts were explicitly mentioned:

Williams: We've got thirty thousand tons we could produce a year. Therefore, with what we got of this value, knowing the need of our country, being here in a position to go to ah well, you know, right to the top on this one.

. . . .

And we've got a combination here, we're a couple of Senators and . . . when we work together, Senator Errichetti and I, it works.

. . . .

Amoroso: [The sheik] feels that with you behind this thing, with the people that you know, the ah government contracts, available, you know, this whole thing—

Williams: Right through.

. . . .

Amoroso: . . . [T]his is why I wanted you to meet with the sheik and he wanted to meet with you because I think without you . . . he would've felt it was just another business deal.

Errichetti: Well, without the Senator, there is no—forget it. There's no, no mines or nothing. In fact, the Senator, Pete had the opportunity wherewithall and the know-how in his position as the United States Senator. . . .

Williams: Yes, I, I've been here decades and, uh, in that position you come up to those positions and you work with the people that make the decisions.

. . . .

Amoroso: Well, then, there—in that respect, then, with you being in that position and contracts and, uh, the like would not be a problem.

Williams: No problem. No. In a situation where we can just sit around and describe, they'll see, it will come to pass.

. . . .

Amoroso: Well, that, like we discussed, ah that end of it is really, uh, not our concern, it's none of our business, who you go to—

Williams: Yeah.

Amoroso: —you know, to do—

Williams: But you can be assured that we, we—

Amoroso: —the manipulation behind the behind the scenes.

Williams: —we have a relationship that will make all of that possible. That's that's all I want to tell you now.

The conversation also revealed the Senator's reason for being helpful and the means for receiving his financial reward:

Williams: I'm not gonna be in this situation forever and I want to have a you know foundations which give me that independence when I, later time.

Amoroso: Alright. Well, then we're agreed on the—I just wanted, uh, for you to tell us who you wanted to have it in—

Williams: Alex.

Amoroso: —so that we're gonna put your shares in Alex's name—

Williams: Alex.

Amoroso: —and he will control them and I think ah he's gonna actually sign them and then, if you want, you can maintain possession of them.

Errichetti: [Inaudible] as he sees fit.

Williams: That's the way to do it. Yeah.

On August 5, at a meeting at a restaurant at John F. Kennedy Airport, the Senator accepted stock certificates representing an 18% share in three corporations Feinberg had formed to carry out the mining venture. As previously agreed, the certificates had been issued to Feinberg, who then endorsed them in blank. In the recorded conversation of the meeting, Williams acknowledged his understanding of the arrangement:

Amoroso: [T]hese are the certificates and I had Alex endorse them . . . .

. . . .

Williams: And he just endorsed these over then.

Amoroso: Yeah.

Williams: In blank.

Weinberg: Right.

Williams: Very good.

Weinberg: So they're blank you can leave them blank and when you want to put your name in it you can put your name in it.

### The Purchase Transaction

At the August 5 meeting, the sheik's representatives broached the possibility that a second group of Arabs might be willing to pay millions of dollars for an outright purchase of the mining venture. On August 27 Katz and Sandy Williams met with the Senator to compare this second opportunity to the first approach of obtaining only loans. According to Sandy Williams' testimony, Katz told the Senator that, as part of the sale, he would have to "stay . . . with the same kind of arrangement . . . and he [help?] get government contracts [for the new owners]." The Senator replied, "We'll go the second way." Sandy Williams also testified that on September 4, Feinberg told the Senator that the "same things that he promised Yassir . . . he would do for the second group," and the Senator said that he would.

The principals in the mining venture met with the Senator on September 11 to decide whether to sell their interests to the second group of Arabs for a sum estimated by Sandy Williams to produce a profit for the group of $70 million. The meeting was videotaped. Under the proposal Sandy Williams was to be employed by the new group to run the venture, and he would be the person to contact the Senator. The Senator's role was spelled out by Weinberg:

The whole thing on this sale depends [on] you and the government getting the contracts for us cause the whole thing depends upon it. You're the one that's gotta give us the O.K. to do it. If you have

any qualms about it, you wanna keep it the same, it makes no difference to me either way. But the whole thing depends upon you to work the same capacity as you working for us to get us government contracts. Ya do it for them. No, in no way would your name be mentioned there or any shares in your name. And if they have to reach you it'll be through strictly, through Sandy.

In the ensuing discussion, the Senator acknowledged, as he had previously told Feinberg and Sandy Williams, that the assistance already promised to the Arab lenders would continue for the Arab purchasers:

[P]ut it this way to them, that this group to give them, whatever they feel there's some assurance this entity will continue with 'em.

. . . .

And be helpful to them.

. . . .

We got this all together on certain premises and they will, they will continue.

At one point the Senator suggested that a more appropriate selling price might be $100 million. Ultimately Feinberg made a motion that the principals agree to sell the venture, and the other four participants—Senator Williams, Sandy Williams, Katz, and Errichetti—all voted "Aye."

On October 7, at a meeting at the Plaza Hotel in New York City, which was recorded, the Senator and Feinberg explained to the sheik's representatives how Williams' profits from the sale would be concealed, at least for the present. The issue arose when Amoroso told the Senator that Katz had understood from the September 11 meeting that "all of a sudden you were going to announce to the world . . . [t]hat you . . . got 15 million dollars." Williams replied, "Oh Christ no." The exact arrangement was unclear, but the essential point was made by Feinberg in these words: "I know how to get him money now without him declaring it." Some form of a blind trust was to be used, which Feinberg assured the Senator would conceal his interest until he retired. "Then you can say I've got it."

The Senator expressed his understanding that while some contemporaneous record would be made, no disclosure would occur until years later:

> There are ways and ways to ... be on a, on a certain record. Now, if it[']s a blind trust er, uhh that's the way for my purposes, I, I will find a way to ... make that kind and nobody knows nothing.
>
> ....
>
> And then way down the road someone said, well, you know he had all of his interests and nobody knew anything. Well, there we have it under the trust. You see. So I've done what I had to do.

### Defenses

In the face of this overwhelming evidence of the Senator's seeking funds for the financing and purchase of a mining venture in which he had an interest in exchange for his assistance in obtaining government contracts for the venture, Williams and Feinberg attempted a defense based on the alternative propositions that either no crimes had been committed, or, if any had been committed, they were the product of government entrapment. *See United States v. Valencia,* 645 F.2d 1158, 1170–72 (2d Cir.1980) (amended 1981) (outlining limited opportunity for alternative defenses of non-involvement and entrapment).[5] The entrapment contention was put to the jury primarily through the argument of counsel. In their testimony the defendants endeavored to deny the commission of any crimes. Feinberg's approach was to claim that it was legitimate for a Senator to agree to use his influence to help obtain government contracts, despite the Senator's having a financial interest in the venture and seeking loans, necessary for the venture's viability, and the sale of the venture in exchange for his assistance. In Feinberg's view, there was nothing wrong with the arrangement because the Senator was only going to be "opening up the doors" and because he and the Senator intended ultimately to disclose the Senator's interest.

The Senator's equally brazen denial of wrongdoing proceeded on two levels. First, he denied that he had agreed to do anything with respect to government contracts. Though the Senator primarily asserted that he had made no promise to *obtain* contracts, he also insisted, in the face of his recorded statements to the contrary, that he had not agreed even to *try* to secure contracts. He told the jury, "I just knew I was not going to say anything about contracts." Second, the Senator contended that whatever he had done was only to benefit his friends, Feinberg and Sandy Williams: "I knew how hard they were working on this mine, my friends, and I wanted to help them." Despite the recorded conversations in which he received his shares of stock and discussed the concealment of his interest, he told the jury, "I was not interested ... in receiving any stock."

### III.

On appeal, the defendants raise primarily three issues relating to or supplementing

---

5. On this appeal, the Government disputes that a defendant who takes the stand and denies commission of a crime may also assert the inconsistent defense that he was entrapped into committing the crime. The point is more pertinent to Senator Williams, who denied committing certain of the acts alleged, than to Feinberg, who denied that the acts committed were criminal in nature. In *United States v. Valencia, supra,* 645 F.2d at 1170–72, we noted the division among the circuits as to whether a defendant may both deny commission of a crime and claim entrapment. We ruled narrowly that a defendant could claim non-participation and also entrapment if "he did not take the stand to deny personally his participation in the transaction and did not affirmatively introduce any other evidence that he was not involved." *Id.* at 1172. That ruling permitted a defendant, who did not testify, to argue to a jury that the prosecution had failed to meet its burden of proving either commission of the crime or the defendant's predisposition. We did not, however, go further and consider whether a defendant who testifies that he did not commit the crime could also claim, in the alternative, that, if he did, his actions were the product of government entrapment. Because the Government did not object to an entrapment charge in this case and because we find no reversible error in connection with the District Court's handling of the defense of entrapment, we leave open the issue whether inconsistent defenses may be asserted in circumstances beyond those that occurred in *Valencia.*

their defense of entrapment. First, they contend that the evidence established entrapment as a matter of law, by which they mean that the evidence was insufficient to permit a jury reasonably to find beyond a reasonable doubt that the defendants were predisposed to commit the crimes charged. Second, they contend that the trial judge erred in his charge concerning entrapment. Third, they contend that the totality of the Government's actions in orchestrating the crimes charged constituted outrageous conduct beyond an outer limit of fairness established by the Due Process Clause.

### A. Entrapment as a Matter of Law

■ Appellants contend, and the Government has never disputed, that there was sufficient evidence of inducement of the defendants by the undercover agents to place upon the prosecution the burden of proving beyond a reasonable doubt that the defendants were predisposed to commit the crimes charged. *See Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). What the parties dispute is whether there was sufficient evidence to permit the jury reasonably to conclude beyond a reasonable doubt that the defendants were predisposed, *i.e.,* "ready and willing without persuasion" to commit offenses of the sort charged and "awaiting any propitious opportunity," *United States v. Sherman,* 200 F.2d 880, 882 (2d Cir.1952) (L. Hand, J.). Appellants allege that the government agents initiated all aspects of the crimes, that the Senator and his cohort initially rejected the idea of any criminal conduct, and that government agents improperly persisted in persuading the Senator to commit crimes that they were not ready and willing to commit. We conclude that the evidence permitted the jury to reach quite different conclusions, although the evidence of governmental persuasion is substantial.

*Government Initiation*

As we have noted, the initial involvement of Senator Williams with the Abscam "sting" operation originated with the Senator, not with the Government. Alerted by Errichetti to the availability of money to be invested by wealthy Arabs, the Senator instructed Feinberg to pursue the matter. Moreover, it was an associate of the Senator's, Sandy Williams, who specified the amount of money, $100 million, that the Senator's group hoped to interest Abdul Enterprises in lending. The first indications that Senator Williams would be of assistance to the venture also originated with the Senator. He had assured Sandy Williams as early as 1975 that he would give the mining venture all the help he possibly could. When the prospect of possible financing from Abdul Enterprises arose in early 1979, the Senator repeated to Sandy Williams his willingness to help the venture and so informed one of the sheik's representatives at the yacht party on March 23, 1979. The first suggestion that the Senator's help might involve use of his official position was Errichetti's statement the next day, March 24, that the Senator "can be of service to you in Washington or wherever. This is government stuff, now." Only after these preliminary indications of the Senator's willingness to be helpful on "government stuff" did the Abscam operatives broach the specific subject of government contracts, first to Feinberg on May 30 and then to the Senator at the Pierre Hotel on May 31.[6]

*Defendants' Reluctance*

The record flatly refutes the claim of reluctance on the part of the defendants. Feinberg's response to the first offer of a criminal opportunity on May 30 was, "We can try." On May 31 the Senator assured Feinberg and Sandy Williams that he understood the importance of his help in getting government contracts, and his first response to a government agent's offer of a criminal opportunity was his statement to

---

**6.** On April 23, 1979, Weinberg asked Sandy Williams whether the Senator could "get us the bids" on government contracts for chemicals. At trial, neither the Senator nor Feinberg made any claim that Sandy Williams ever mentioned this inquiry to them.

the sheik's representatives at the luncheon meeting that day that he would "sure try" to get contracts. The Senator repeated his willingness to seek government contracts for the mining venture in conversations with Sandy Williams on June 16 and June 24. On June 19, at a meeting in his Washington office with Errichetti and Feinberg, the Senator expressed no reluctance to Errichetti's urging that he impress the sheik how willing he was to help obtain government contracts. As Feinberg reported to Weinberg in a recorded conversation the night of the Washington meeting, "It's all beautiful. He's very agreeable. No problem." The extent of the Senator's willingness to "try" was made abundantly clear in the Senator's June 28 conversation with the sheik when he offered to use his influence with various government officials including the President. In fact, the record is barren of expressions by the Senator of any hesitation whatever in agreeing to use his influence to try to obtain Government contracts in order to secure financing for the mining venture.

Appellants take unwarranted comfort in one remark attributed to the Senator by Errichetti and in statements of Sandy Williams, Feinberg, and Katz. Errichetti, in a recorded conversation on June 27, related the June 19 conversation in the Senator's Washington office in which he had told the Senator how important it was to be persuasive when the Senator met the sheik on June 28. Errichetti claims he said to the Senator, "You're gonna fucking guarantee that fucking contract. He said 'no way.'" If the jury credited this remark, which significantly was not mentioned by Senator Williams in his trial testimony, they were entitled to conclude that the Senator was demurring only to making a claim that he would "guarantee" a government contract; his willingness to use his influence to *try* to obtain contracts remained undiminished.

What Williams' brief calls a "negative response" by Sandy Williams and Feinberg is their momentary uncertainty as to whether the Senator would try to obtain government contracts. Sandy Williams said on April 23, "Well, I don't know about

that." Feinberg said on May 31, just before the Pierre Hotel luncheon, "Well, this I didn't know until now I have to ask him that." However, Feinberg's very next sentence was, "I would assume, I know that he's often opened up many doors. You understand what I'm talking about, and with his blessing [—]."

No more helpful to defendants is Katz' comment to Weinberg in a recorded conversation on June 10, that the Senator "doesn't use that power for any advantages." The context makes clear that Katz was referring to the Senator's reluctance to use power for leadership within the Senate. As Katz explained, "He's not the kind of a guy like Long or Kennedy, where they've got the power and they use it." When Weinberg then said, "Well he said he would get us the contracts you know," Katz replied, "Oh there's no question if he's got an interest, he'll do something like that, naturally."

Even more unhelpful to appellants' cause are the occasions on which, according to appellants, the Senator refused opportunities to receive unlawful payments, separate from the millions of dollars he agreed to accept for the financing and purchase of the mining venture. These episodes, in fact, provided the jury with additional evidence of a damning nature. The first episode concerns Weinberg's July 9, 1979, offer to Sandy Williams to pay the Senator $20,000 in cash as "expense money." Sandy Williams testified that he relayed the offer to the Senator on July 18. The Senator asked, "Sandy, do I have to be handed the money?" to which Sandy Williams answered, "Pete, I don't want you to be handed the money." The Senator then suggested that Sandy Williams "go and get the 20,000" and agreed to split the money with him. The next day the Senator suggested that Sandy Williams send part of the cash to the Senator's son who needed funds to purchase a car. When the undercover agents learned of the Senator's unwillingness to accept the cash personally, they decided not to make the payment.

The second episode occurred on January 15, 1980, when the Senator met with the sheik for the last time. The conversation was recorded. The sheik offered to pay the Senator cash in return for the Senator's assisting him to immigrate and obtain permanent residence. The Senator refused, explaining "when I work in that area, that kind of activity, it is purely ... public." But, despite having been offered a bribe, the Senator stated his willingness to help the sheik with his immigration problem because this would help the mining venture succeed. The Senator referred to his help as "a desirable thing to do for you, personally" and "part of creating something of value, bringing in that ore."

*Government Persuasion*

Once Senator Williams expressed a willingness to agree to use his influence to try to obtain government contracts, Weinberg, acting for the Government, endeavored to make sure that when the Senator met with the sheik, he would spell out his willingness clearly and emphatically for the benefit of the sheik and the television camera. To achieve this objective, Weinberg enlisted Errichetti and Feinberg and then took on the assignment directly. On June 7, Weinberg told Errichetti, in a recorded conversation, "Let Tony [Agent Amoroso] and you speak to Senator ... all we want to hear from him is that he's going to get us some government contracts." On June 15, in a recorded conversation, Weinberg told a group of the Senator's associates, including Errichetti and Feinberg, "The Senator's gotta be told alright? In no [un]certain terms that he's gotta move his fucking ass to get the goddamn government contracts."

The messengers warmed to their task. In a recorded conversation on June 27 Errichetti gave a group of the Senator's associates this account of a June 19 session he had had with the Senator in his Senate office:

When I went there, he didn't say two fucking words. I got Pete by the fucking throat, I tell you about as close as I came in this office. Let me tell you something ... don't you go fucking this thing up. I

got a chance to make a fucking million dollars .... All you're gonna do is give a fucking speech like you never gave in your life .... You're gonna fucking guarantee that fucking contract. He said "no way."

....

He said, "no way." I said you're gonna fucking say it.... Never mind about doing it. You're gonna fucking say it."

At the same June 27 session, Feinberg reported, "I also told Pete that he after that won't ever have to open his mouth." In anticipation of the next day's meeting with the sheik, Feinberg telephoned the Senator from the meeting and told him, "Eric [Errichetti] will talk to you before you go in and just like he said it[']s a bullshit speech."

On June 28, in a recorded conversation ten minutes before the Senator's meeting with the sheik, Weinberg personally carried the message to the Senator in these words:

Forget the mine. Don't even mention the mine. All you have to do is tell him, alright.

....

How high you are in the Senate. He's interested in you.

....

Without, without you there is no deal. You are the deal. You put this together. You worked on this and you can get, you got the government contracts. Without me there is no government contracts.

....

[A]nd you tell him in no [un]certain terms without me there is no deal. I'm the man. I'm the man who's gonna open the doors, I'm the man who's gonna do this to use my influence and I guarantee this. Follow me?

....

All bullshit.

....

And that's it, it goes no further, it[']s all talk, all bullshit. That's all he wants to hear.

....

It's a walk-through. You should be out of there in twenty minutes.

. . . .

You're on stage for twenty minutes.

. . . .

So you ready to go on-stage?

As we recounted in *Myers II, supra*, 692 F.2d at 839–40, this "coaching" by Weinberg, especially the June 28 episode, dismayed at least some Government prosecutors and precipitated a meeting of prosecutors and F.B.I. agents on August 9, 1979, at which Weinberg was cautioned about such tactics.

### Basis for a Finding of Predisposition

Notwithstanding the evidence of persuasion, the jury was fully entitled to find, from the totality of the evidence, that the defendants were "ready and willing" to commit the crimes charged as soon as the opportunity was first presented—to Feinberg on May 30 and to Senator Williams on May 31—and at all times thereafter. At no time did either defendant hesitate or express any reluctance. Even if the jury believed that the Senator told Errichetti on June 19 that he could not "guarantee" government contracts, he continually expressed to the agents, and to his associates in private conversations, his willingness to use his influence to try to obtain the contracts for a venture in which he had a concealed interest. And the evidence fully entitled the jury to conclude that the defendants understood that the Senator's agreement to help to obtain contracts was a condition for obtaining the loan and later the prospect of a sale. The jury was also entitled to consider his prompt willingness to accept half of the $20,000 in "expense" money that Weinberg discussed with Sandy Williams. And the jury could also consider his agreement to assist the sheik on an immigration problem as "part of creating something of value, bringing in that ore."

The "coaching" carried out by Weinberg on June 28 and earlier through Errichetti and Feinberg was a factor to be considered by the jury in assessing predisposition, but these tactics do not detract from the sufficiency of the evidence of the Senator's predisposition because the jury was entitled to conclude, as the Senator himself testified, that he paid little attention to what Errichetti and Weinberg told him and decided for himself what he would say at the crucial June 28 meeting with the sheik.[7] Indeed, the salient feature of the entrapment defenses asserted in this case is that both defendants testified and neither one even claimed that the persuasion of the government agents had prompted them to commit the crimes charged.[8] That omission may have been the inevitable consequence of their trial strategy of simultaneously denying criminal conduct and claiming entrapment. Whatever their motive, the defendants, by their testimony, made it relatively easy for the prosecution to sustain its burden of proof on predisposition.

On the entire record, Judge Pratt was correct in ruling that the prosecution presented sufficient evidence of the defendants' predisposition to permit the jury to reject their defense of entrapment.

### B. Challenge to the Entrapment Instructions

■ Appellants contend that the entrapment instructions were erroneous in two respects. They first claim that Judge Pratt

---

7. On direct examination, when asked about Weinberg's "coaching" session with him on the morning of June 28, the Senator testified:

> I think I said yesterday, this is not for me, what he's talking about, that kind of effort to impress the Sheik. I was going to do it my way. So, I didn't really concentrate on that which was meaningless to me.

On cross-examination, this exchange occurred:

> Q. And didn't Errichetti tell you on June 19th that the only thing the sheik was interested in is your telling him that you would get government contracts?

> A. If he said that, it didn't register with me because my mind was not accepting government contracts as any part of this thing.

Earlier, when asked on direct examination whether he had been "put off" by what Errichetti and Weinberg had urged him to say, he answered:

> It was offensive but it didn'[t] mean a great deal to me to tell you the truth.

8. Feinberg claimed in his trial testimony that he had been "under a lot of pressure by Mr. Weinberg," but he also insisted, "We had done nothing at all illegitimate."

removed the issue of entrapment from the jury's consideration. The basis for this claim is the following portion of the charge:

> You are not to be concerned with whether the prosecution or the F.B.I. agents or Mr. Weinberg acted legally or illegally, properly or improperly or whether the Abscam investigation itself was conducted properly. Those are questions which must be decided by me at an appropriate time.

The challenged sentences were not error. It was not any part of the jury's function to decide whether the Abscam tactics were illegal or improper. Their function, as Judge Pratt told them, was to decide whether they were satisfied beyond a reasonable doubt that each defendant was predisposed to commit the crimes charged. And with respect to that question Judge Pratt instructed as follows:

> In determining whether either defendant, if afforded a favorable opportunity, was predisposed to engage in the kind of criminal activity for which he is charged, you should look to the totality of the circumstances shown by the evidence, including the nature and extent of the inducement offered. In weighing the circumstances to determine this issue of predisposition, you may consider, among other things, the impact that the conduct of the government agents had on the defendant, both directly and indirectly through its effects on the alleged co-conspirator Sandy Williams, George Katz, and Angelo Errichetti.

In the same vein, the sentence immediately preceding the passage complained of by the appellants instructed the jury as follows:

> What the F.B.I. agents and Mr. Weinberg did should concern you only to the extent that you find that it affected the conduct and state of mind of a defendant or other participants in the conspiracy or only insofar as it may affect the credibility of any witness with respect to the matters before you.

The charge, taken as a whole, fully and fairly permitted the jury to consider the Abscam tactics as they related to the defense of entrapment.

The second claim arises from Judge Pratt's response to a question asked by the jury during deliberations. The jury's note read as follows:

> Would you kindly explain the legal guidelines of a scam operation?
>
> At what point do the practices or methods used in a scam become entrapment in regards to the law?
>
> Does entrapment have to be established from day one of the indictment or can it be established further along in the operation?

This note precipitated an extended colloquy between Judge Pratt and counsel for both defendants. Attorney Koelzer, representing Williams, began by noting that part of the inquiry had misstated the burden of proof with respect to entrapment. Whereas the note had asked, "Does entrapment have to be established from day one of the indictment," Koelzer correctly pointed out that, once inducement is shown, the Government has to prove predisposition. Taking the jury's phrase, he maintained that predisposition had to be proved " 'from day one.' In other words, from on or about the first day of January, 1979, these two men were predisposed beyond a reasonable doubt—." Judge Pratt promptly interjected, "That is an overstatement." Attorney Batchelder, representing Feinberg, pointed out that the question related to entrapment, not predisposition, and that entrapment can occur anytime during the scheme. Disputing Attorney Koelzer, he added, "So when he says that you have to have entrapment from square one, the answer is no, no, no, no." He then suggested that the entrapment portion of the original charge be reread in full. Judge Pratt then ascertained that both counsel agreed to that suggestion.

When the jury was recalled, Judge Pratt began by making sure the jury understood that, since inducement was not disputed, the defendants had no burden to establish anything with respect to entrapment, that the burden was upon the Government to

disprove the defense by showing that the defendants were predisposed to commit the crimes. At that point, he made the statements that appellants now contend created reversible error:

> You said from day one, or at some other time. You have to decide when the crime was committed, if you get to that element, and then determine as of that time when he committed the crime was he predisposed to do it or wasn't he.

This was followed by a rereading of the entrapment portion of the original charge. At the conclusion of the supplemental charge, Judge Pratt asked if there were exceptions and counsel took none, other than to preserve their prior objections to the original charge.

 As a general proposition of law the fragment of the supplemental response now challenged by appellants was erroneous. A defendant's predisposition is not to be assessed "as of that time when he committed the crime." Normally, predisposition refers to the state of mind of a defendant before government agents make any suggestion that he should commit a crime. By "state of mind" we do not mean to require specific prior contemplation of criminal conduct. It is sufficient if the defendant is of a frame of mind such that once his attention is called to the criminal opportunity, his decision to commit the crime is the

product of his own preference and not the product of government persuasion. The phrase "ready and willing" adequately captures that concept and does so in a manner likely to be comprehensible to juries.

██ In the circumstances of this case, however, the erroneous statement in the supplemental charge does not warrant reversal for several reasons. First, neither counsel, after hearing the statement, objected to it or asked for a clarifying instruction. Second, neither counsel had suggested to Judge Pratt a correct statement of the law that would have answered the jury's questions. Attorney Koelzer's initial suggestion that predisposition had to be proved from "day one . . . on or about the first day of January, 1979" was, as Judge Pratt noted, an overstatement. The earliest that predisposition had to be established was as of the time when the agents first presented the criminal opportunity to the defendants, which was May 30 with Feinberg and May 31 with the Senator. There was no reason to focus the jury's attention on the Senator's state of mind at the start of the indictment period, which was five months before any criminal opportunity was broached by the undercover agents.[9] Third, the isolated remark complained of was followed by a rereading of the full charge on entrapment,[10] which correctly set

---

**9.** The standard charge on entrapment requires the prosecution to prove that the defendant was ready and willing to commit the crimes charged "before anything at all occurred respecting the alleged offense." 1 E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 13.09, at 364 (3d ed. 1977). In many cases, including this one, undercover government agents discuss non-criminal matters with a target before presenting a criminal opportunity. Such preliminary contact is normally not conduct "respecting the alleged offense." Since the entrapment defense exonerates a defendant who has been induced to commit a crime he would not otherwise have committed, the inducement must consist of efforts to persuade him to commit the crime, and those efforts will normally not occur until the criminal proposition has been broached. Simply cultivating the friendship of a target preparatory to presenting a criminal opportunity is not inducement to commit a crime.

We do not rule out the possibility, however, that cases may arise in which the agents in their preliminary contacts with a target indirectly suggest that a crime might occur, even though they do not explicitly invite the target to commit one. In the pending case, the first contact by the Abscam operatives with the defendants that involved any discussions "respecting the alleged offense" was the presentation of a criminal opportunity on May 30.

**10.** The charge included the following language:
> Under the law of entrapment, therefore, that leaves for you, the jury, to determine as the decisive question on this entrapment issue whether the defendant was predisposed to commit the crime; that is, whether he was ready and willing to commit a crime such as charged here whenever a favorable opportunity was offered.
>
> To sustain its burden of proof the government has to satisfy you that its agents have not induced an innocent person, but that the inducement which brought about the of-

forth the applicable principles, *see United States v. Parisi,* 674 F.2d 126, 128 (1st Cir. 1982), and, following *United States v. Viviano,* 437 F.2d 295, 299 (2d Cir.), *cert. denied,* 402 U.S. 983, 91 S.Ct. 1659, 29 L.Ed.2d 149 (1971), focused the jury's attention on the three possible bases of proving predisposition—a design to commit the offense formed prior to any inducement, a prompt and unhesitating agreement to the corrupt proposal, or an existing course of similar conduct. Fourth, and most important, on the facts of this case, the statement as to time of predisposition was not prejudicial because the criminal opportunity was accepted when it was first presented. The time when the crime was first committed virtually coincided with the pertinent time for assessing predisposition. Thereafter the Senator simply repeated and emphasized his willingness to commit the crimes. On the facts of this case, the supplemental charge, taken as a whole, contained no prejudicial error.

### C. Claim of a Due Process Violation

■ Appellants contend that the methods used by the government agents in developing the cases against them exceed an outer limit of fairness mandated by the Due Process Clause. This argument is to be distinguished from the basic defense of entrapment. That defense, as recognized in the federal courts, focuses on the state of mind of the defendant and precludes conviction only when government agents by their inducements prevail upon a person who was not predisposed to commit the type of crime charged. Though it has been insistently urged that the entrapment defense should focus exclusively on the conduct of the agents and preclude a conviction whenever their conduct could be expected to induce an average person to commit the crime, *see, e.g., Sherman v. United States, supra,* 356

U.S. at 378–85, 78 S.Ct. at 823–27 (Frankfurter, J., concurring); *Sorrells v. United States, supra,* 287 U.S. at 453–59, 53 S.Ct. at 216–19 (Roberts, J., concurring), a majority of the Supreme Court has never accepted this objective test. However, in recent years, the minority of those on the Supreme Court favoring an objective test has been somewhat encouraged by the suggestion, subscribed to by five members of the Court in *Hampton v. United States,* 425 U.S. 484, 491–95, 96 S.Ct. 1646, 1650–53, 48 L.Ed.2d 113 (1976) (Powell, J., concurring, joined by Blackmun, J.); *id.* at 495–500, 96 S.Ct. at 1652–55 (Brennan, J., dissenting, joined by Stewart and Marshall, JJ.), that extreme cases may arise where the government conduct was so outrageous as to violate due process, even though the evidence permitted the jury to find that the defendant was predisposed. Since the Supreme Court has never applied the Due Process Clause to invalidate a conviction based on "outrageous" governmental inducement, we do not know what sort of circumstances the Court believes would meet this elusive standard. In assessing whether the circumstances of a given case present such extreme facts, care must be taken, as the Third Circuit has observed in an Abscam case, "not to undermine the Court's consistent rejection of the objective test of entrapment by permitting it to reemerge cloaked as a due process defense." *United States v. Jannotti,* 673 F.2d 578, 608 (3d Cir.) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982).

■ We have previously declined to hold that the Abscam operation violated the Due Process Clause, *Myers II, supra,* 692 F.2d at 836–47; *United States v. Alexandro,* 675 F.2d 34, 39–42 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982), and we see no basis for concluding that the activities of the government opera-

---

fenses charged simply brought about another instance of the kind of conduct which the defendant was prepared to engage in, if offered an opportunity which appeared favorable. Thus, if the prosecution has satisfied you beyond a reasonable doubt that the defendants were ready and willing to commit

the offenses charged whenever a favorable opportunity was offered to commit them, then you may find the government did no more than furnish a convenient opening for the criminal opportunity in which the defendants were prepared to engage.

tives directed against the defendants in this case exceeded the constitutional limits of fairness. Appellants point most insistently to the "coaching" activities of Weinberg, which we have recounted. It is understandable that agents who have heard a suspect make incriminating statements or been told by others that he has made them will be anxious to provide an opportunity for the suspect to repeat these statements under circumstances where they can be surreptitiously, though lawfully,[11] recorded. Appellants maintain, however, that Weinberg went further and endeavored to put words in the Senator's mouth.[12] However these "coaching" tactics might square with our personal notions of appropriate law enforcement conduct, our judicial task is to measure these tactics against the as yet undefined standard of "outrageous" conduct that the Supreme Court has suggested might offend constitutional limits. That standard was not exceeded in this case. There is lacking in this record any indication that the "coaching" was persistently directed at an unwilling subject in an unconscionable effort to erode his law-abiding instincts. The most that Weinberg did was to spell out for the Senator how to commit the crimes, but his "coaching" involved neither pressure nor persistent exploitation of personal weakness, as might occur if an agent preys upon an addict's need for narcotics. *See Sherman v. United States, supra.* Moreover, it would be hard to imagine that government conduct could ever be deemed so outrageously unfair to a defendant as to warrant dismissal of charges when the defendant asserts that he scarcely paid any attention to what was said to him.

One aspect of this case that distinguishes it from prior Abscam convictions is the size of the inducements offered to the defendants. The proposed loan of $100 million and the proposed profits of $70 million from the sale unquestionably involve sums of money far in excess of the amounts normally tendered by government agents in an attempt to catch an "unwary criminal," *Sherman v. United States, supra,* 356 U.S. at 373, 78 S.Ct. at 821. However, as Judge Pratt pointed out, 527 F.Supp. at 1101, the loan was to be repaid with interest. Therefore, its value to the defendants was not the amount of the loan, but rather the profits they anticipated making as a result of securing financing for their venture. Whatever profits were anticipated were the result of the defendants' estimates; the agents did not offer to assure any particular level of profits in connection with the proposed loan. Moreover, the amount of financing needed for the venture was determined by Sandy Williams and proposed to the agents. Only the purchase proposal involved selection by the Abscam operatives of a dollar figure, and even this figure was related to the figures already proposed by the principals in the mining venture. The combined property that the second group of Arabs was purportedly interested in buying included the American Cyanamid plant, which Sandy Williams had estimated could be purchased for $70 million.

We doubt that the size of an inducement can ever be considered unconstitutional when offered to a person with the experience and sophistication of a United States Senator. In this case the claim is wholly without merit. There is no evidence that the Senator's anticipated share of the profits from the loan or the sale exerted an unconscionable pressure upon him. He readily agreed to the loan transaction, and when the purchase was proposed, he calmly

---

11. Appellants' claim that the recordings violated their Fourth Amendment rights is entirely without merit. In every instance, recordings were made by a participant to the conversations in whom the other speakers had simply misplaced their confidence. *United States v. White,* 401 U.S. 745, 752–53, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453 (1971); 18 U.S.C. § 2511(2)(c) (1976).

12. There was evidence at the due process hearing, denied by Weinberg, that at the August 9, 1979, meeting at which Weinberg was reprimanded, he told the agents that he had "to put words in people's mouths or we won't make any cases." The remark was testified to by two FBI agents. *See Myers, II, supra,* 692 F.2d at 839. Whether or not Weinberg made the remark, his conduct glaringly reveals that the alleged remark accurately reflected his intent.

discussed with his associates whether the loan or the purchase was more advantageous for them and then, without any hesitation, agreed to the purchase. He even suggested at one point that the sale price should be increased to yield profits of $100 million. When a Senator elects to interest himself in transactions involving large sums of money, he cannot claim that it is unconstitutional for undercover agents to frame their offers of criminal opportunities within the financial context he has already established.

Apart from the clear evidence of Weinberg's "coaching" and the size of the inducements, the appellants' complaints about Abscam are not different from those voiced by defendants in *Myers II.* These include the use of as disreputable a person as Weinberg, the failure to record every conversation with all of the co-conspirators (although no claim is made of an exculpatory remark made to a government agent that was not recorded), the lack of a basis for suspecting Senator Williams before responding to the overtures initiated by Errichetti and Feinberg at the Senator's suggestion, and the failure to ascertain that the Senator would accept a criminal opportunity before the agents met with him. None of the circumstances cited by the appellants, nor their aggregate effect, constitutes the sort of outrageous imposition upon an individual that might exceed a due process test of constitutional fairness. *See Myers II, supra; United States v. Alexandro, supra; United States v. Jannotti, supra.*

. [8] One aspect of the evolution of the criminal conduct evidenced by the record merits additional comment. When the Abscam operatives broached the possibility of criminal conduct to the Congressmen in *Myers II,* the proposal was, from the start, a clear-cut invitation to commit a crime: $50,000 was offered solely in exchange for an agreement to use official influence with respect to an immigration matter. The criminal opportunity presented to Senator Williams differs in one important respect. The financial inducement, the $100 million

loan, was initially discussed in connection with what appeared to be an entirely legitimate business transaction. Then, after Errichetti suggested that the Senator "can be of service," the agents broached the prospect of the Senator's unlawfully using his influence for private gain.

We recognized in *Myers II* the possibility that "at some point deliberate governmental efforts to render ambiguous events over which agents can exercise considerable control would transgress due process limits of fundamental fairness." 692 F.2d at 843. The subtle shifting of a legitimate proposal into an unlawful one, as occurred in this case, has the potential for presenting a jury with close questions of intent and risking incorrect fact-finding—a risk that could be substantially reduced if agents simply put to a target the kind of straightforward proposal offered to the Congressmen in *Myers II.* Of course, many cases involve the risk that juries will incorrectly assess key facts, especially those, like intent, that cannot be objectively ascertained. It is not the risk of factual error that creates unease; it is the needless creation of that risk by governmental action.

We have reviewed the record with this concern in mind and have reached the conclusion that the clarity of the evidence places this case well short of any point at which we might be apprehensive that the verdicts had been rendered needlessly questionable by governmentally created ambiguities in the presentation of a criminal opportunity to a target. The evidence not only permitted the jury to find the Senator and his accomplice guilty; it reveals them as unmistakably involved in a corrupt agreement to misuse public office for private gain. The ultimate terms of the proposal were put to the Senator with clarity on repeated occasions. His understanding was evidenced by his own recorded statements on June 28 and again on September 11. And his state of mind was fully revealed not only by his statements with respect to the crimes charged but also by his willingness to accept cash if he could receive it indirectly and his willingness to

help the mining venture succeed by assisting on an immigration matter for which he had been offered (and had refused) a cash bribe. On this record we find no unconstitutional conduct that taints the validity of a judgment of conviction.

## IV.

■ Appellants make three claims concerning the construction of the statutes under which they were indicted. First, they contend that Counts Four and Eight failed to state an offense under the conflict-of-interest statute, 18 U.S.C. § 203(a), because the prospective government contracts for the purchase of titanium were not identified with sufficient particularity. The statute punishes receipt of compensation for services to be rendered in relation to any "proceeding, application, . . . contract, claim, . . . or other particular matter" in which the United States has a substantial interest.[13] We accept the appellants' argument, based on the structure of the statute, that the phrase "other particular matter" has the effect of causing the adjective "particular" to modify all of the preceding nouns, including "contract." However, we disagree that the force of the adjective is so strong as to require pleading or proof of a single contract identified by contract number or similar individualized detail. It is sufficient if the compensation has been received for services to be rendered with respect to a particular category of contracts. The description of government contracts for the purchase of titanium sufficiently particularizes the services to be rendered in this case to state an offense. The fact that the statute applies to future proceedings not yet pending, *United States v. Evans*, 572

F.2d 455, 481 (5th Cir.), *cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978); *United States v. Johnson*, 215 F.Supp. 300, 316 (D.Md.1963), *aff'd*, 337 F.2d 180, 196 (4th Cir.1964), *aff'd on other grounds*, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), indicates that it applies to a particular category of matters, and need not be narrowed to just one identified contract, which might not be known until a proceeding involving the contract was actually pending.[14]

■ Second, the appellants contend that Count One, the conspiracy charge, failed to state an offense under 18 U.S.C. § 371 because it alleged that an objective of the conspiracy was to deprive the United States of the "honest and faithful services of a United States Senator." Their point is that a United States Senator, having been elected by the citizens of his or her state, owes honest and faithful service only to them and not to the United States. The argument is without merit. The numerous statutes enacted to punish criminal behavior by Members of Congress demonstrate the assertion of a significant interest on the part of the national government in the honest performance of duties by those elected to the national legislature. There can be no serious doubt as to the constitutionality of these statutes.

■ Third, appellants contend that the phrase "anything of value," receipt of which is proscribed by the statutes punishing bribery, 18 U.S.C. § 201(c), and unlawful gratuity, 18 U.S.C. § 201(g), means something that objectively has actual value. Their point in this regard is that the stock received by the Senator had no commercial

---

13. The scope and background of section 203(a) are reviewed at length in *Myers II, supra*, 692 F.2d at 853–58.

14. Unlike Congressman Murphy, whose conviction for violating the conflict-of-interest statute was reversed, *see Myers II, supra*, 692 F.2d at 853–58, Senator Williams made no claim that his efforts with respect to matters before government agencies would be limited to giving advice, as distinguished from acting in a representative capacity to secure favorable treatment. Though the charge as to the conflict-of-

interest violation in the pending case broadly (and erroneously, *id.*) stated that the services covered by section 203(a) include giving advice, the broad charge was not objected to at trial, the evidence showed only an agreement to try to influence government officials to award contracts, and no claim concerning the scope of services covered by section 203(a) is raised on appeal. On this record, the error with respect to the section 203(a) charge is harmless and has been waived.

value, and that Judge Pratt erred when he told the jury that stock could be a thing of value "if, regardless of its actual worth in the commercial world, you find that the defendant believed that the stock had value for himself." We think Judge Pratt correctly construed the statutes to focus on the value that the defendants subjectively attached to the items received. The phrase "anything of value" in bribery and related statutes has consistently been given a broad meaning, *e.g., United States v. Girard,* 601 F.2d 69, 71 (2d Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979), to carry out the congressional purpose of punishing misuse of public office. Corruption of office occurs when the officeholder agrees to misuse his office in the expectation of gain, whether or not he has correctly assessed the worth of the bribe. When the Senator received shares of stock in the three corporations organized to hold the properties of the mining venture, he expected these shares to have considerable value, representing not only the potential value of the properties but also the benefit of the contemplated loan of $100 million.

## V.

Only two of the appellants' remaining contentions merit any discussion. First, appellants contend that the District Court erred in admitting evidence of two transactions in which Senator Williams used his influence in an effort to advance the financial interests of himself and his wife. One effort concerned the application of the Ritz-Carlton Casino to obtain a casino license from the New Jersey Casino Control Commission and to secure exemption from Commission guidelines requiring new construction. The Hardwicke Companies, part of the consortium backing the Ritz-Carlton, employed the Senator's wife as a consultant and later paid a $50,000 fee to defendant Feinberg. The Senator himself expected to receive $1 million as his share of a finder's fee to be paid in connection with financing for the Ritz-Carlton, which was to be supplied by Abdul Enterprises. Just prior to the Commission's vote on the Ritz-Carlton application in May 1979, the Senator, with-

out any urging by the Abscam operatives, called the Commission chairman. In a recorded conversation on October 7, 1979, the Senator acknowledged making the call; his efforts and similar efforts by Feinberg were asserted by Feinberg, in the same conversation, to have "changed" the Commission's "mind" and saved $30 million. The other effort concerned the Senator's contacts during the 1970's with various New Jersey officials on behalf of Biocel of New Jersey, a corporation formed by Sandy Williams to franchise garbage recycling technology. Sandy Williams had given half of his interest in Biocel to Senator Williams, the Senator had brought Feinberg into the project, and the Senator and Feinberg had subsequently decided to give a 13% interest in a subsidiary of Biocel to the Senator's wife.

Conduct "'morally indistinguishable'" from the offenses charged is probative on the issue of predisposition, *United States v. Viviano, supra,* 437 F.2d at 299 n. 3 (quoting *United States v. Becker,* 62 F.2d 1007, 1009 (2d Cir.1933)), and admissible subject to the usual weighing of probative force against unfair prejudice as mandated by Fed.R.Evid. 403. Since counsel for appellants argued strenuously to the jury that any criminal conduct occurring in connection with the Senator's agreement to try to obtain government contracts for the titanium mining venture was the product of governmental inducement, it was appropriate to present evidence of the Senator's use of his influence on behalf of himself and his wife in circumstances where no government agent asked him to do so. Even if, as appellants contend, the Senator's conduct in the Ritz-Carlton and Biocel matters did not violate New Jersey law, it was probative of his willingness to agree to take similar action to obtain titanium contracts from the federal government, conduct that violates federal law. Judge Pratt's admission of the Ritz-Carlton and Biocel evidence was well within his discretion.

The remaining contention is that Count One of the indictment was duplici-

tous in alleging a conspiracy both to defraud the United States and to commit various substantive offenses. "The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for 'The conspiracy is the crime, and that is one, however diverse its objects.'" *Braverman v. United States,* 317 U.S. 49, 54, 63 S.Ct. 99, 102, 87 L.Ed. 23 (1942) (quoting *Frohwerk v. United States,* 249 U.S. 204, 210, 39 S.Ct. 249, 252, 63 L.Ed. 561 (1919)). This principle has been specifically applied to a single count charging conspiracy to defraud the United States and to commit substantive offenses. *United States v. Manton,* 107 F.2d 834, 839 (2d Cir.1939), *cert. denied,* 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1940). The specificity of the conspiracy-to-defraud allegations and the jury's verdicts on the substantive counts eliminate any possibility of the concerns expressed in *United States v. Rosenblatt,* 554 F.2d 36, 40–42 (2d Cir. 1977), on which appellants rely, that a count alleging only a conspiracy to defraud the United States in some unspecified way risks conviction without either an allegation or proof of the essential nature of the fraud.

## VI.

We have considered appellants' other claims and are satisfied that they are without merit and do not warrant discussion. For all of the reasons set forth in this opinion and for the further reasons set forth in the comprehensive opinion of Judge Pratt, denying the defendants' post-trial motions, we conclude that both appellants were fairly tried and that there is no legal infirmity in their convictions. The judgments appealed from are affirmed.