UNITED STATES of America

v.

Samuel EVANS; Guriel Eisenberg; Rafael Israel Eisenberg; William Northrup; Avraham Bar'Am; Nico Minardos; Alfred Flearmoy; Hermann Moll; Ralph Kopka; Hans Bihn; Isaac Hebroni; John Delaroque; Bernard Veillot; B.I.T. Company, Import, Export, and Metals Limited; Dergo Establishment; Flear Holdings Incorporated S.A.; International Procurement and Sales, Inc. and Vianar Anstalt, Defendants.

No. 86 Crim. 384 (LBS).

United States District Court,
S.D. New York.

July 10, 1987.

Rudolph W. Giuliani, U.S. Atty., for S.D. N.Y., New York City, for plaintiff; Lorna G. Schofield, Asst. U.S. Atty., of counsel.

Grand & Ostrow, New York City, for defendant Samuel Evans; Paul R. Grand, Lawrence S. Bader, of counsel.

Neal J. Hurwitz, New York City, for defendant Rafael Israel Eisenberg; Brigid Hogeland, of counsel.

Power, Weiss & Marks, New York City, for defendant Guriel Eisenberg; Jonathan Marks, of counsel.

Michael H. Sporn, New York City, for defendant William Northrup.

Budd Larner Gross Picillo Rosenbaum Greenberg & Sade, New York City, for defendant Avraham Bar'Am; Larry J. Silverman, Shira A. Scheindlin, Richard A. Greenberg, of counsel.

William M. Kunstler, New York City, for defendant Nico Minardos; Ronald L. Kuby, of counsel.

Richard B. Lind, New York City, for defendant Alfred Flearmoy.

Charles T. Theofan, Garden City, N.Y., for defendant Herman Moll.

Pascarella, Illmensee & Carra, Garden City, N.Y., for defendant Ralph Kopka; Lawrence V. Carra, of counsel.

Louis R. Aidala, New York City, for defendant Hans Bihn.

SAND, District Judge.

This criminal case, according to the Government's view, exposes aspects of the hidden world of private international arms sales. The fourth superseding indictment charges numerous defendants—individuals and entities—with participating in five separate illegal conspiracies to sell and transfer American-made defense articles to a putative Iranian buyer named Cyrus Hashemi. Specifically, the present indictment charges, *inter alia*, that in order to gain approval of the contemplated transfers, defendants conspired to make false and fraudulent statements to agencies of the United States Government regarding the destination of the defense articles. Substantive counts based on false statements in documents actually filed with the United States are also alleged against certain defendants in connection with one of the planned transactions, the so-called "Dergo Establishment Arms Deal." The lead defendant, Samuel Evans, who is named in the substantive counts and as a participant in each of the alleged conspiracies, is said to have acted as the intermediary between the seller and the buyer in four of the five contemplated transactions.

None of the arms deals referred to in the indictment was ever consummated. In fact, Cyrus Hashemi, the putative Iranian buyer in each of the business deals, was an agent of the United States Government. Working with a corps of other Government informants, Hashemi entered into a series of tape recorded negotiations with individual defendants. As the transactions progressed, the sting operation was terminated and the arrests in this case were made.

The defendants have filed scores of motions, some of which have been previously decided. The Government, too, has moved to preclude certain testimony, references and argument at the trial. This Opinion addresses all issues raised in the pending defense motions except those which relate to discovery matters and to Cyrus Hashemi, who died after the Government's investigation ended. Also unaddressed in this Opinion are the motions relating to wire and mail fraud counts, including the motion

filed July 6, 1987 by defendant Evans with respect to the Supreme Court's recent holding in *McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). These matters will be addressed in a separate Opinion.

## MOTIONS TO DISMISS FOR LACK OF JURISDICTION

Defendants challenge the jurisdiction of the United States over the crimes alleged in the indictment on a number of grounds. First, defendants allege that jurisdiction was improperly procured through a fraud on the government of Bermuda. Second, defendants challenge the authority, and alternatively the intent, of Congress to prosecute the crimes alleged in the indictment. Specifically, defendants contend that the United States lacks jurisdiction over such crimes because the extraterritorial application of the Arms Export Control Act, 22 U.S.C. § 2778 ("AECA"), would violate international law. Defendants further urge this Court to dismiss the conspiracy counts of the indictment, 18 U.S.C. § 371, on the basis that the government impermissibly manufactured jurisdiction.

For the reasons stated below, the motions to dismiss based on these grounds are denied.

### A. *Jurisdiction was not Procured Through a Fraud on the Government of Bermuda*

Defendants argue that the indictment should be dismissed because representatives of the United States committed fraud on the government of Bermuda, thereby defeating the jurisdiction of this Court. Defendants claim that because the offenses with which defendants are charged are not extraditable, the United States gained jurisdiction over five of the defendants—Evans, the Eisenbergs, Northrup, and Bar'Am—by convincing the government of Bermuda, through misrepresentation, to deport them to the United States. Defendants claim that United States representatives presented a misleading picture to Bermuda by portraying that the defendants were to be traveling into Bermuda to consummate billions of dollars in arms sales to "certain terrorist groups".

The defendants fault the United States first with failing to inform Bermuda that in fact, no arms were to be imminently sold. Rather, because defendants came to Bermuda to negotiate (or according to the United States, execute) contracts for arms sales that would never materialize, defendants argue that Bermuda should have been told that the United States was merely conducting a "sting operation." Defendants further charge that the United States committed fraud on Bermuda by informing its officials that defendants were attempting to sell arms to terrorists, when in fact, defendants believed they were dealing directly with the government of Iran.

■ The Court concludes that jurisdiction over the defendants was not procured by fraud. Even assuming, *arguendo*, the facts are as presented by defendants, the Bermuda officials were sufficiently apprised of the circumstances when they made the decision to deport. First, defendants do not dispute that Bermuda's knowledge of defendants' activities extended beyond the information contained in the purportedly misleading letter from the United States Customs Service to the Bermuda Attorney General indicating that defendants sought to "consummat[e]" a fraud to divert weapons "to certain terrorist groups." The Attorney General had also at his disposal information directly obtained from two meetings and briefing sessions with United States officials. More compelling, however, is the fact that the Bermuda court opinions that upheld the Deportation Order did not state that defendants sought to divert weapons to specific terrorist groups. Rather, the opinions contained statements—that are both consistent with defendants' version of their activities and factually accurate by most accounts—that the arms were destined for Iran, a country which "harbours and encourages terrorists."

Similarly, the Court finds based on the facts as presented by defendants, that even though Bermuda was not advised that the United States was engaged in a sting oper-

ation, it was informed of accurate information which was critical to Bermuda's deportation decision. That is, Bermuda was fully aware that the United States believed, rightfully or wrongfully, that defendants were *prepared* to proceed with a two billion dollar sale of arms to Iran, irrespective of whether arms actually and imminently would be diverted.

■ Not only as a matter of fact, but as a matter of law, defendants' jurisdictional claim must be rejected. We note at the outset that defendants have not pointed us to any applicable treaty provision conferring judicially enforceable rights on defendants. Under these circumstances, the Court must agree with the Government's contention that absent protest by Bermuda as to a violation of international law and where Bermuda has not sought defendants' return, defendants have no standing to assert that a fraud has been committed upon Bermuda. *See, e.g., United States v. Davis*, 767 F.2d 1025, 1030 (2d Cir.1985); *United States v. Reed*, 639 F.2d 896, 902 (2d Cir.1981). The rights arising out of treaties and applying in cases of extradition are rights belonging to the asylum state, with rights accruing to individuals being, at most, derivative through the state. *See, e.g., United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 67 (2d Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975); *Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir.), *cert. denied*, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973).

Even assuming that defendants had standing on their own to raise claims of fraud upon a foreign government, the law still does not support their contentions. The Court agrees with the Government, contrary to defendants' assertions, that the doctrine of specialty has not been violated in this case. The specialty doctrine holds that one may not be tried for a crime other than the offense for which one was extradited. *United States v. Rauscher*, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886); *Shapiro v. Ferrandina*, 478 F.2d 894 (2d Cir.), *cert. denied*, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973).

■ The Court's determination that the instant indictment does not violate the specialty doctrine does not rest, however, on the distinction the Government attempts to draw because the defendants were deported, and not formally extradited. *See United States v. Molina-Chacon*, 627 F.Supp. 1253 (E.D.N.Y.1986), *aff'd*, 817 F.2d 201 (2nd Cir.1987) (where defendant waived extradition and was deported instead, doctrine did not apply); *United States v. Valot*, 625 F.2d 308 (9th Cir.1980) (where defendant is deported, doctrine does not apply). Contrary to the Government's position, the specialty doctrine does apply here. Given the circumstances surrounding defendants' deportation, including the communications between the United States and Bermuda officials leading up to the deportation, this case appropriately falls among that class of cases in this Circuit holding the specialty doctrine applicable when extradition is obtained through acts of comity by the surrendering government instead of by treaty. *See Fiocconi v. Attorney General of the United States*, 462 F.2d 475 (2d Cir.), *cert. denied*, 409 U.S. 1059, 93 S.Ct. 552, 34 L.Ed.2d 511 (1972).

■ Nevertheless, we reject defendants' arguments based on the rule of specialty. Our decision rests on our determination that the crimes charged are not "separate offenses" from the crimes described to the Bermudian authorities. *See United States v. Paroutian*, 299 F.2d 486 (2d Cir.1962) (test is whether extraditing country would consider the offense actually tried "separate"). Even under defendants' view of the facts, and in the absence of any affirmative protest from Bermuda, the Court finds that the attempted arms sale to terrorist groups described to Bermudian authorities is of the "same character" as the conspiracies with which defendants are charged. *See Fiocconi*, 462 F.2d at 481; *United States v. Rossi*, 545 F.2d 814 (2d Cir.1976), *cert. denied*, 430 U.S. 907, 97 S.Ct. 1178, 51 L.Ed.2d 584 (1977).

■ Finally, the Court finds baseless defendants' claim that this Court should be divested of jurisdiction by virtue of the illegality of the Government's conduct in

its dealings with Bermuda. Under the *Ker-Frisbie* rule, a court's power to prosecute a defendant is not impaired and due process not violated by the illegality of the method by which jurisdiction is obtained, including forcible abduction of the defendant. *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886); *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952). This broad rule is tempered only in cases of truly egregious and shocking government conduct, such as where a defendant is drugged and tortured. *See United States v. Toscanino*, 500 F.2d 267 (2d Cir.1974). Absent such extreme conduct, courts will find no due process violation. *See e.g., United States v. Reed*, 639 F.2d at 901; *United States ex rel. Lujan v. Gengler*, 510 F.2d at 66. In this case, the scant evidence of government misconduct causing a fraud on the government of Bermuda—and indeed, as explained above, we have found no actionable fraud—simply does not rise to the level of a due process violation under existing law. The Court rejects defendants' claims that jurisdiction be defeated because the United States committed a fraud on the government of Bermuda.

B. *Principles of Extraterritoriality as the Basis for Jurisdiction*

Defendants contend that jurisdiction of the United States over this case—where many of the alleged criminal acts took place outside the United States and many of the defendants otherwise had little connection to the United States—is inappropriate because "not reasonable." *See Restatement (Second) of Foreign Relations Law* § 403 (Tent. Draft No. 7, 1986) ("*Restatement Dr. 7*") (state may not exercise jurisdiction to proscribe law with respect to activities having connections with other states where unreasonable). Thus, we first address the contours of Congress' power to legislate against the crimes charged in the indictment as defined by international principles of extraterritoriality.

The United States Constitution does not bar extraterritorial application of the penal laws, and numerous cases have upheld the authority of the United States to enact and enforce criminal laws proscribing acts outside the United States that have adverse effects inside the United States. *See, e.g., United States v. King*, 552 F.2d 833 (9th Cir.1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977), and cases cited therein; *Restatement (Second) of Foreign Relations Law* § 402(1)(C) (Tent. Draft No. 6, 1985) ("*Restatement Dr. 6*"). Two principles of extraterritorial jurisdiction recognized under international law are applicable here: the effects or "objective territoriality" principle and the "protective" principle. *See, e.g., United States v. Pizzarusso*, 388 F.2d 8 (2d Cir.), *cert. denied*, 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395 (1968).

■ The effects principle recognizes that "[a]cts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect...." *Strassheim v. Daly*, 221 U.S. 280, 285, 31 S.Ct. 558, 560, 55 L.Ed. 735 (1911); *see also United States v. Egan*, 501 F.Supp. 1252, 1257 (S.D.N.Y.1980); *Restatement Dr. 6, supra*, at § 402(1)(C). The related protective principle imparts jurisdiction when actions have a potentially adverse effect upon the security or governmental functions of a sovereignty. *See, e.g., Pizzarusso*, 388 F.2d at 10–11; *Restatement Dr. 6, supra*, at § 402(3). The Restatement "takes the position that a state may exercise jurisdiction [under these circumstances] when the effect or intended effect is substantial and the exercise of jurisdiction is reasonable...." *Restatement Dr. 6, supra*, at § 402 comment d.

■ Furthermore, although cases are rare, international law permits jurisdiction under these theories even if the act or conspiracy at issue is thwarted before ill effects are actually felt in the target state. *Restatement Dr. 6, supra*, at § 402 comment d; *see, e.g., United States v. Brown*, 549 F.2d 954, 956–57 (4th Cir.), *cert. denied*, 430 U.S. 949, 97 S.Ct. 1590, 51 L.Ed.2d 798 (1977). For that matter, jurisdiction may be proper even if no acts were

committed in that state, especially where the statute does not require proof of an overt act. *See, e.g., United States v. Ricardo,* 619 F.2d 1124 (5th Cir.), *cert. denied,* 449 U.S. 1063, 101 S.Ct. 789, 66 L.Ed.2d 607 (1980); *United States v. Fernandez,* 496 F.2d 1294 (5th Cir.1974); *Pizzarusso,* 388 F.2d at 11.

█ It would clearly have been a reasonable exercise of jurisdiction for Congress to have anticipated that the Arms Export Control Act would be applied to persons and events outside of its borders. The Reporters' Notes to the Seventh Tentative Draft of the *Restatement on Foreign Relations Law* provides that "it is more plausible to interpret a statute of the United States as having reach beyond the nation's territory when it is international in focus ... than when it has a primarily domestic focus...." *Id.* at n. 2. In this case, defendants are charged, *inter alia,* with conspiring to present, and in several cases actually presenting, false documents to the United States in order to obtain approval to ship United States arms to Iran in violation of the Arms Export Control Act. This statute, by its terms, is inherently international in scope. Under both the effects and protective principles, the United States has jurisdiction to legislate in order to protect itself from this type of fraud, irrespective of whether the party making the false representation, or conspiring to do the same, is located within United States borders, and regardless of whether the conspiracy is averted before effects are actually felt in the United States.

## C. *Claims of Manufactured Jurisdiction*

We next turn to defendants' claims that the United States impermissibly manufactured jurisdiction. Defendants base this contention on their claim that many of the territorial contacts with the United States were introduced either by the government informants or agents. We find defendants' arguments unpersuasive.

Defendants contend that the Government brought informant Hashemi to the United States for the sole purpose of manufacturing jurisdiction under the conspiracy stat-ute, 18 U.S.C. § 371, and the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343. We will address the counts under these last two statutes in a subsequent Opinion. *See supra,* at 978. Defendants contend, *inter alia,* that the Government manufactured jurisdiction when telephone calls made wholly within Europe between Hashemi and defendants were secretly routed through New York, where the calls were taped by government agents. Defendants contend that such routing of calls was "unrelated" to defendants' plans to sell arms to Hashemi.

Defendants focus on the conspiracy charges and argue that there is no jurisdiction under section 371 unless defendants have committed an overt act within the territory of the United States. For this proposition, defendants cite *United States v. Winter,* 509 F.2d 975 (5th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975), a case brought not under 18 U.S.C. § 371, but under the conspiracy provision of the Controlled Substance Import and Export Act, 21 U.S.C. § 963. *But see United States v. Rodriguez,* 612 F.2d 906, 919 n. 37 (5th Cir.1980) (en banc), *aff'd on other grounds sub nom., United States v. Albernaz,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981) (proof of overt act not necessary under drug conspiracy statutes); *United States v. Egan,* 501 F.Supp. 1252, 1260 (S.D.N.Y.1980) (overt act in United States under drug conspiracy statute not necessary).

█ This argument must be rejected. Instead, we adhere to the reasoning of those courts that have "regularly inferred [the] extra-territorial reach of conspiracy statutes on the basis of a finding that the underlying substantive statute reached extra-territorial offenses, even though [the] conspiracy charges came under separate code sections." *See United States v. Layton,* 509 F.Supp. 212, 225–26 (N.D.Cal.), *appeal dismissed,* 645 F.2d 681 (9th Cir.), *cert denied,* 425 U.S. 972, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981) and cases cited therein; *see also Chua Han Mow v. United States,* 730 F.2d 1308, 1311 (9th Cir.1984), *cert. denied,* 470 U.S. 1031, 105 S.Ct. 1403,

84 L.Ed.2d 790 (1985). The instant indictment charges defendants, *inter alia,* with conspiracy to violate the Arms Export Control Act, 22 U.S.C. § 2778. Under this line of cases, our finding that the underlying Arms Export Control Act applies extra-territorially, *see* discussion *infra,* extends to the relevant conspiracy statute, 18 U.S.C. § 371, giving it concurrent extra-territorial reach. On this basis, jurisdiction under the conspiracy statute in this case was validly obtained, regardless of whether an overt act was committed within United States borders. Defendants' claim of manufactured jurisdiction under the conspiracy statute is therefore denied.[1]

### MOTIONS TO DISMISS FOR FAILURE TO STATE A CRIME

Assuming, *arguendo,* that Congress had the authority to proscribe the acts alleged in the Indictment and reach persons located and events occurring outside of the United States, defendants contend that Congress did not intend that the Arms Export Control Act, 22 U.S.C. § 2778, reach these acts. For the reasons stated below, we reject this argument.

### A. *The Motions to Dismiss the B.I.T. Counts Are Denied*

Defendants Rafael Israel Eisenberg and Guriel Eisenberg, who are charged, *inter alia,* with conspiring to violate 22 U.S.C. § 2778, part of the Arms Export Control Act ("AECA"), and the implementing regulations, move to dismiss the indictment on a number of theories. Movants contend that the charges contained in the B.I.T. counts of the indictment fail to state a crime against them in that the recited sections of the Act and the regulations do not apply to the facts as alleged. In addition, and as an independent ground for dismissal, the Eisenbergs assert that AECA may not be applied in an extraterritorial fashion as is sought in the indictment. Finally, the Eisenberg defendants argue that the act of

state doctrine bars prosecution of the crimes with which they are charged. Finding defendants' arguments unpersuasive, we deny the motions to dismiss.

The core argument which the Eisenberg defendants advance centers on the scope and construction of AECA, a review of which is essential to an understanding of the issues presented. The statute reflects Congress' commitment "to bring about centralized and more effective control within the Executive Branch over, and a stronger voice for Congress in, United States Arms exports, Government and commercial." Senate Committee on Foreign Relations, International Security Assistance and Arms Export Control Act of 1976–77, S.Rep.No. 876, 94th Cong., 2d sess. 8 (1976). The legislative history indicates that the goal of the statute mirrors that of the Arms Control and Disarmament Act— to seek "a world which is free from the scourge of war and the dangers and burdens of armaments ..." *Id.*

AECA is structured to implement this policy in at least two ways. 22 U.S.C. § 2753 governs the eligibility of foreign countries and international organizations for the purchase of certain defense articles and services from the United States. Sales to foreign countries are proscribed unless certain conditions are satisfied. Included among those conditions is an agreement on the part of the transferee country or organization "not to transfer title to, or possession of" the article or service transferred "unless the consent of the President has been first obtained." 22 U.S.C. § 2753(a)(2). In the event that a transferee country fails to abide by the terms governing the transfer of defense articles, such as by transferring the articles without prior consent, the transferee risks losing the opportunity to participate in the United States arms sales programs. *See, e.g.,* 22 U.S.C. §§ 2753(c)(1)(A), (c)(1)(B). The rem-

---

**1.** We note also that defendants' argument has been mooted as to certain defendants by the return of the fourth superseding indictment alleging that those defendants caused to be submitted false arms license applications within the Southern District of New York—overt acts by these defendants occurring within the territory of the United States without the participation of government agents.

edies available under section 2753, therefore, are political and economic.

Complementing the statutory provisions of section 2753, and the political remedies available for a violation thereof, is another statutory section, 22 U.S.C. § 2778, entitled the "Control of Arms Exports and Imports." Section 2778(a)(1) provides:

In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.

Criminal penalties are available to enforce this section and may be imposed upon "[a]ny person who willfully violates any provision of this section . . ., or any rule or regulation issued [thereunder], or who willfully, in a registration or license application or required report, makes any untrue statement of a material fact or omits to state a material fact required to be stated therein where necessary to make the statements therein not misleading." 22 U.S.C. § 2778(c).

The indictment accuses the Eisenbergs of plotting to transfer—illegally—numerous defense articles situated in Israel and owned by the Israeli government.[2] It is alleged that in furtherance of the conspiracy, the Eisenbergs "would obtain end user certificates that would falsely and fraudulently attest" that the defense articles to be transferred to Iran, were destined for a country acceptable to the United States. *See* Count One at 4–E. In addition, the indictment charges that the Eisenbergs conspired with others "to represent and cause to be represented to the United States Department of State or Defense in applications to resell, divert, transfer, transship and dispose of" the defense articles that the transferee would be a country acceptable to the United States. *Id.* at 4–F. According to the prosecution: "[T]he [i]ndictment charges and the Government submits that the Eisenbergs would have caused Israel to make false representations to the United States concerning the destination of certain U.S. arms then in the possession of the Israeli Government." Letter to the Court, Rudolph W. Giuliani (by AUSA Schofield) (Dec. 9, 1986). Count One charges, *inter alia*, that the Eisenbergs conspired to violate 22 U.S.C. § 2778(c), and Title 22 Code of Federal Regulations, Sections 121.1, 123.9, 123.10, 126.1(a) and 127.

What principally distinguishes the B.I.T. Company arms deal from the other conspiracies charged in the indictment is the fact that the weapons that the defendants allegedly conspired to ship had previously been transferred to, and at the time of the conspiracy were in the possession of, a foreign government—Israel. In light of these peculiar circumstances and the distinctions between 22 U.S.C. § 2753 and 22 U.S.C. § 2778, the Eisenbergs contend that the indictment fails to state a crime. Juxtaposing the provisions of section 2753 and section 2778, the Eisenbergs argue that the

---

2. Defendant Bar'Am, named in ten counts of the indictment, joins in the Eisenbergs' arguments that the Court lacks subject matter jurisdiction, the indictment fails to state a crime, and the charges are non-justiciable under the act of state doctrine. Our analysis of the indictment as it relates to the Eisenbergs and the B.I.T. conspiracy also applies to defendant Bar'Am and the counts in which he is named.

We also deny defendant Northrup's motion to dismiss on the ground that he had been "erroneously lumped into the B.I.T. arms deal . . ." *See* Affirmation of Michael H. Sporn, Esq. at 5 (Sept. 15, 1986). Similarly, we reject at this time defendant Northrop's argument that many of the items listed in the conspiracy and substantive counts of the indictment are not subject to export control. The Government intends "to prove at trial through a competent witness that the items in question are on the [United States] munitions list." *See* Letter to the Court, Rudolph W. Giuliani (By AUSA Schofield) (June 25, 1987).

only sanctions which may properly be imposed based on the illegal conspiracy alleged in Count One are the economic and political sanctions set forth in section 2753, the statutory section which addresses the obligations of countries to which defense articles have been shipped. This argument, we believe, misconceives what the Government has stated is the theory underlying Count One of the indictment.

The Government agrees with the Eisenbergs that 22 U.S.C. § 2753 imposes sanctions on foreign countries that violate contractual transfer and resale restrictions. In addition, the Government concedes that if the Eisenbergs were in fact agents acting on behalf of the Israeli Government, they would be cloaked with sovereignty and thus immune from prosecution under the criminal penalty provisions of section 2778. Acknowledging that the Eisenbergs are licensed arms dealers in Israel, the Government's position is that "unless the licensed arms dealer is acting as, in the true sense, an agent of the Israeli Government which would cloak it with the sovereignty of the Government, then the licensed arms dealer would be liable under 2778." Transcript of Proceedings ("Transcript"), SSSS 86 Cr. 384, at 25–26 (Jan. 5, 1987); see also Transcript at 30–31. Were there an agency relationship in this case, the parties appear to agree, the available statutory remedy would be the political and economic sanctions set forth in section 2753.

While the Government acknowledges that the Israeli Government owns the weapons allegedly to be transferred in the B.I.T. arms deal, it explains that the contemplated transactions might have developed in a variety of ways. It is possible, the Government argues, that the Eisenbergs intended to procure the weapons by duping the Israeli Government, and/or by working with Israeli officials acting in a non-sovereign capacity. In other words, the Government disputes the contention that simply because the defense articles involved were situated abroad and owned by a foreign country, it follows that private persons who conspire to gain access to those weapons and to cause a transfer to occur without proper approval are immune from prosecution.

■ We agree with the Government's analysis. Furthermore, we believe that the burden of producing facts which would bring the Eisenbergs within the purview of section 2753, and thereby take them out of the category of those individuals subject to section 2778 and the implementing regulations, properly falls on the defendants who seek a pretrial dismissal of the indictment. Cf. United States v. Chestnut, 533 F.2d 40, 45 (2d Cir.1976) ("Court must look at the allegations pleaded in the indictment to determine whether an offense has been charged"). In this case, there is no indication that the Eisenberg defendants maintain a relevant relationship with the Government of Israel. The Eisenbergs have not filed any affidavits or documents on this point. Indeed, the Israeli government, responding to Court-initiated inquiries made in connection with the bail applications in this case, stated:

> Neither the hearings in the case of U.S. v. Samuel Evans, et al., nor the need for Messrs. Guri and Israel Eisenberg and Avraham Bar'Am to testify therein will be reason for the [Government of Israel] to take any steps to prevent them from returning to the U.S.

Letter of Oded Eran, Minister-Deputy Chief of Mission (Embassy of Israel), to Philip Wilcox, United States Department of State (Feb. 10, 1987). Under these circumstances, we decline to adopt the view that the only appropriate and available remedy based on the facts as alleged in the B.I.T. counts lies against the Government of Israel.

As additional support for the motions to dismiss the B.I.T. counts, the Eisenbergs argue that section 2778 and the implementing regulations do not apply to foreign persons who attempt to transfer American-made weapons situated abroad. This argument is distinct from the argument previously discussed which, as indicated, is predicated on the purported application of section 2753 to illegal transfers of defense articles owned by a foreign government.

In effect, the Eisenbergs contend that even if section 2753 and the existence of non-criminal remedies against states *qua* states do not bar prosecution of the Eisenbergs on the B.I.T. conspiracy, section 2778 and the regulations are inapplicable by their own terms.

Specifically, the Eisenbergs, excerpting a portion of the statutory language, assert that section 2778 "focuses on the control over arms exports directly from the U.S. by individuals, primarily 'persons of the United States.'" Eisenbergs' Memorandum of Law in Support of Dismissal of the Indictment ("Eisenbergs Memorandum") at 9, quoting from 22 U.S.C. § 2278(a)(1). To buttress their reading of the law, the Eisenbergs cite to those sections of the International Traffic in Arms Regulations ("ITAR") which, in implementing section 2778, seek to control the activities of persons in the United States who either manufacture or export defense articles. *See, e.g.,* 22 C.F.R. §§ 122.1, 123.9(a), 123.9(b).

■ Revisiting the relevant statutory language in considering the argument that AECA does not apply to persons acting abroad, we note that section 2778(c) provides that "any *person* who willfully violates section 2778 or the regulations issued [thereunder] ... shall upon conviction be fined not more than $100,000 or imprisoned not more than two years, or both." 22 U.S.C. § 2778(c) (emphasis added). The underscored language is not confined to persons acting in the United States or "persons of the United States." A literal interpretation of that language suggests that section 2778(c) encompasses foreign persons who violate the statute and the implementing regulations. Furthermore, section 2778(a)(1) states rather broadly that: "[i]n furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and export of defense articles and defense services...." Although the quoted sentence continues, as the Eisenbergs highlight, by authorizing the President "to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services,"

nothing in the statutory language or legislative history reflects a congressional intent to limit the President's authority to establish regulations which control the transfer of American-made weapons after they are exported directly from the United States. As noted earlier, the legislative history reflects an intent to control the international flow of armaments. *See* Senate Committee on Foreign Relations, International Security Assistance and Arms Export Control Act of 1976–1977, S.Rep.No. 876, 94th Cong., 2d Sess. 8 (1976). It would seem to be entirely consistent with this statutory purpose, which is largely repeated in the statute itself at 22 U.S.C. § 2778(a)(1), to seek to control the worldwide transfer of American-made weapons once they leave United States borders.

Other circumstances indicate that the statute is not intended to limit itself to the control of the original export of American defense articles. Section 2753, discussed previously, expressly provides for restrictions on the resale abroad of American-made weapons without prior United States approval. More pertinent to this indictment, the regulations promulgated pursuant to section 2778 reflect an intent to attach restrictions to the transfer of the commodities in question, and to exert this control by imposing requirements on persons who control those commodities after they leave the United States. For example, the resale and transfer regulations referred to in Count One of the indictment state that:

> The written approval of the Department of State must be obtained before reselling, diverting, transferring, transshipping, or disposing of a defense article in any country other than the country of ultimate designation as stated on the export license, or on the shipper's export declaration....

22 C.F.R. § 123.9(a). A statement of this requirement must appear at the time of initial export on the shipper's export declaration, the bill of lading, and the invoice. *See* 22 C.F.R. §§ 123.9(a) and (b). Furthermore, section 127.1(b) of the regulations, which is also referred to in Count One, provides that:

All persons abroad subject to U.S. jurisdiction who obtain temporary custody of defense articles exported from the United States ... and irrespective of the number of intermediate transfers, are bound by the regulations of this subchapter in the same manner and to the same extent as the original owner-transferor.

The regulations thus clearly evidence an intent to control the world-wide flow of American-made weapons by reaching "persons abroad" who obtain "temporary custody of a defense article exported from the United States" without regard to the number of "intermediate transfers." While "temporary custody" is not specifically defined in 22 C.F.R. § 127.1(b), the type of control over the destination of the weapons allegedly to be transferred in this case would seem to be included within the appropriate definition. The indictment states in the methods and means section that the Eisenbergs "would obtain" the articles to be transferred and "through the defendant B.I.T. COMPANY, would sell them to Galaxy Trade, Inc. for Iran." *See* Count One at 4–D. Under this scenario, the obligation to seek and obtain the United States approval for any transfer would thus arise. Similarly, the original transferor would have been bound to seek and obtain the United States approval for the export. The regulations thus ensure that in all cases, the written approval of the Department of State is to be obtained prior to the export or resale of regulated defense articles. *See e.g.*, 22 C.F.R. §§ 123.1, 123.9(a), 123.-10(d).

The foregoing analysis is pertinent to another issue the Eisenbergs raise in support of their motions to dismiss—namely, whether the International Traffic in Arms Regulations effectuate the will of Congress in enacting the Arms Export Control Act. The Eisenbergs argue that even if the regulations are construed to require foreign persons to seek and obtain United States approval prior to the transshipment of American made defense articles after they have left American borders, the regulations extend beyond the statutory mandate. Because, as we have discussed, we believe the statute permits the President to seek to control the international flow of American-made weapons, we believe the regulations, whose application the Eisenbergs contest, are "consistent with the statute under which they are promulgated," *United States v. Larionoff*, 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977), and therefore valid.

### B. *The Act of State Doctrine*

The last argument we address in considering the Eisenbergs' motions to dismiss is the contention that the act of state doctrine bars prosecution of the defendants for their alleged participation in the B.I.T. Company arms deal. Defendants' act of state argument shares a number of predicate assumptions with the argument that only the political and economic sanctions within AECA, 22 U.S.C. § 2753, rather than the criminal penalty provisions, 22 U.S.C. § 2778, apply to the facts of this case. Both arguments are based on the fact that Israel owns the weapons which the Eisenbergs are charged with conspiring to transfer illegally by causing fraudulent end user certificates to be submitted to the United States.

The fact that the Government of Israel owns the American-made defense articles allegedly involved in the B.I.T. transaction makes that government, the Eisenberg defendants assert, "the only possible offerror, as it were, in regard to any contract for their sale." Eisenbergs' Memorandum at 27. For the contemplated transactions to proceed to completion, this argument runs, the Government of Israel would at some point have had to submit to the United States end user certificates showing a false destination of the Israeli-owned defense articles. Thus, the Eisenbergs argue, "[a]n intervening act of state would be required to complete the objects of the conspiracy." *Id.* at 27. Given this set of circumstances, the Eisenbergs argue that the charges contained in the B.I.T. counts, are non-justiciable because the court would have to "pass judgment on the legality of a sovereign act by a foreign state in a politically sensitive area." *Id.* at 28.

The origins of the act of state doctrine may be found in *Underhill v. Hernandez*, 65 F. 577 (2d Cir.1895), *aff'd*, 168 U.S. 250, 18 S.Ct. 83, 48 L.Ed. 456 (1897). In *Underhill*, the Supreme Court affirmed the refusal to permit a tort suit for unlawful detention against a former military chief of the City of Bolivar, Venezuela because "[t]he acts complained of were the acts of a military commander representing the authority of the revolutionary party as Government, which afterward succeeded and was recognized by the United States." *Underhill*, 168 U.S. at 254, 18 S.Ct. at 85. In so holding, the Supreme Court stated:

> Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the Government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through means open to be availed of by sovereign powers as between themselves. *Id.*

More modern statements of the act of state doctrine emphasize that the doctrine is not based on principles of sovereign immunity, but rather is rooted in the constitutional separation of the powers of the three branches of Government. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 421–23, 84 S.Ct. 923, 936–37, 11 L.Ed.2d 804 (1964) (United States Court may not review alleged illegality of an uncompensated taking of property by Cuban Government from Cuban corporation). The Supreme Court has observed that "[t]he doctrine as formulated in past decisions expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere." *Id.* at 423, 84 S.Ct. at 938.

Because the act of state doctrine is premised on a proper view of the separation of powers, "the position taken by the Executive is a relevant factor." *Republic of the Philippines v. Marcos*, 806 F.2d 344, 358 (2d Cir.1986). Here, of course, the Executive's view of whether this case presents an affront to its ability to conduct foreign policy is asserted in the most forceful manner; it is prosecuting the defendants with respect to the B.I.T. transaction. Although the Executive's position on the act of state issue is "not dispositive," *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 773 n. 4, 92 S.Ct. 1808, 1816 n. 4, 32 L.Ed.2d 466 (1972) (Douglas, J., concurring in judgment), and the issue of justiciability is a "judicial question", *Allied Bank International v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 521 n. 2 (2d Cir.), *cert. dismissed*, 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985), we note that in initiating and pursuing the criminal prosecution on these facts, the Executive has set in motion the very process which defendants assert will affect adversely the Executive's special role in foreign policy.

A threshold issue in a case in which there is an attempt to invoke the act of state doctrine is whether there is "an act of a foreign *state* by which that state has exercised its jurisdiction to give effect to its *public interests.*" Restatement (Second) of Foreign Relations Law § 41 (1965) (emphasis added). The Second Circuit has observed that courts have "repeatedly affirmed" that the doctrine is inapplicable unless the acts at issue are "*public* acts of the *sovereign*". *See Republic of the Philippines*, 806 F.2d at 358 (emphasis in original), and cases cited therein. The cases emphasize that the acts must be "public" and "governmental" for the act of state doctrine to render non-justiciable claims in which the validity of those acts are at issue. *Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 73 (2d Cir.), *cert. denied*, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977).

In this case, we believe the Eisenbergs have failed to demonstrate in connection with their motions to dismiss that the prosecution of this case will "inevitably call for a judgment of the sovereign acts" of the State of Israel. *Hunt*, 550 F.2d at 73 (1977). This case is distinguishable from *Hunt*, in which plaintiff's antitrust complaint alleged, *inter alia*, that Libya's deci-

sion to enact a law nationalizing plaintiff's assets was the result of the defendants' antitrust conspiracy. In affirming the district court's dismissal of Hunt's claim on act of state grounds, the *Hunt* Court highlighted that upon the seizure of Hunt's property, Libya's President had announced that the nationalization was a political act directed at the United States on behalf of the "Arab peoples." *Id.* at 73. The Second Circuit observed in *Hunt* that an adjudication of the plaintiff's claim "necessarily would require a wholesale examination of Libyan policy—how did it treat other companies, what provoked its displeasure with Hunt...." 550 F.2d at 78. Defendants have not demonstrated that the present case would necessarily require similar evaluations of public sovereign acts of a foreign state. As stated earlier, in our discussion of the purported relevance of 22 U.S.C. § 2753, the defendants have not indicated that they bear a relationship with Israel which would cloak their private actions, which will be the subject of this prosecution, with sovereignty. In view of the foregoing, and the totality of the circumstances set forth in the indictment, we do not find that the B.I.T. conspiracy is nonjusticiable on the basis of the separation of powers concerns underlying the act of state doctrine.

## MOTIONS TO DISMISS ON DUE PROCESS GROUNDS

A. *Alleged Governmental Misconduct During the Course of the Investigation*

Defendants move to dismiss the indictment in its entirety on the theory that the Government's conduct of the investigation was "so abhorrent to fundamental notions of fairness as to violate the Due Process Clause." Memorandum of Law in Support of Defendant Samuel Evans' Pre-Trial Motions (Excluding Discovery Motions) at 3. The motions are denied.

The legal standards which control defense motions based on alleged due process violations are well settled and the allegations of misconduct in this case must be viewed in light of these principles. For due process to be violated, "[p]olice overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction." *Hampton v. United States*, 425 U.S. 484, 495–96 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113 (1976) (Powell, J., concurring). Under this test, the actions of the agents for the Government "must be of the tenor to shock the conscience." *United States v. Alexandro*, 675 F.2d 34, 35 (2d Cir.), *cert. denied*, 459 U.S. 835, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982); *see also United States v. Romano*, 706 F.2d 370, 372 (2d Cir.1983) (due process not violated unless Governmental conduct is "so repugnant and excessive as to shock the conscience") Under these standards, to be sure, the instances in which the Government violates the constitutional guarantees "will be exceedingly rare." *Alexandro*, 675 F.2d at 35.

The defense argues that this is one of the rare cases in which the Government's investigative conduct was so outrageous as to shock the conscience. In his original moving papers, defendant Evans describes the due process motion as based primarily on four loosely grouped and overlapping areas of alleged governmental misconduct. First, the defense contends that the Government, in violation of the defendants' due process rights, repeatedly attempted to persuade the defendants to abandon their intent to engage in an approved, covert and legal arms transaction in favor of an illegal, unapproved transaction. Second, the defense urges the Court to consider the size of the inducements offered to the defendants and the manner in which the Government purportedly attempted to overcome the defendants' alleged lack of disposition to commit the crimes charged. The third area of alleged misconduct focuses on what the defense describes as the Government's repeated attempts to "sculpt" the evidence by discouraging the defendants from discussing their interest in engaging in approved transactions. As a fourth ground for dismissal, the defendants cite what they characterize as the unfairly premature termination of the investigations at a point when events were ambiguous.

We reject the defendants' argument that the Government's investigative conduct, viewed as a whole, transgresses the outer limits of fairness which the due process clause imposes. In our view, the Government's role was not outrageous and does not "shock the conscience." To the contrary, it appears that the agents involved in the "sting" operation repeatedly sought to clarify, rather than obscure, the nature of the transactions which the defendants were pursuing.

Defendant Evans argues that the Government unfairly attempted to persuade him to abandon the originally contemplated legal transactions in favor of illegal ones. It appears that with respect to the so-called Vianar Anstalt conspiracy, one of the five transactions on which the indictment rests, two separate arms sale alternatives were discussed. "Option I", pursued by certain defendants in connection with the Vianar Anstalt deal, involved the contemplated sale of United States military equipment by fugitive defendants Veillot and DelaRoque with the prior covert approval of the United States Government. "Option II", the illegal Vianar Anstalt alternative, allegedly involved a conspiracy to sell United States arms located exclusively outside the United States by fraudulently procuring United States approval. It is the "Option II" conspiracy which underlies Count Five of the indictment. Count Five charges fugitive defendants Veillot and DelaRoque, as sellers, defendant Evans, for his role as an intermediary, and defendant Bihn, for his role in attempting to obtain false end-user certificates to be submitted to the United States Government. *See* Affidavit of AUSA Lorna G. Schofield at ¶¶ 6–8 (Oct. 1986). Defendant Minardos, who was apparently aware of the "Option I" discussions, is not charged in the Vianar Anstalt conspiracy. The Government affirms that the tapes, which have been provided to the defense, do not indicate that the other alleged sellers (Raphael and Guriel Eisenberg, William Northrup, General Avraham Bar'Am, Alfred Flearmoy, and Herman Moll), named in other counts in connection with other transactions, were aware of the "Option I" Vianar Anstalt discussions. None of these individuals is charged in connection with the Vianar Anstalt conspiracy. Thus, the relevance of defendant Evans' argument that the Government unfairly sought to induce him to abandon plans to consummate a legal transaction is somewhat limited.

The Government's pursuit of the illegal "Option II" with the Vianar Anstalt participants does not support the conclusion that the Government agents violated the due process clause. Rather, it appears that the pursuit of Option II in the Vianar Anstalt deal was an attempt to avoid ambiguity with respect to the intent of the participants. The actions of the undercover agents in informing the Vianar Anstalt defendants that the legal option was not viable and that the parties needed to plan an unlawful, covert deal tended to clarify the nature of the transactions.

Similar considerations compel us to reject the due process attack to the extent that it is based on the alleged attempt to "sculpt" the evidence by excessively "coaching" the targets. Defendants allege that the coaching was carried out by encouraging "false talk about obtaining phony end user certificates." Defendants' Memorandum at 18. We do not find on the record before us (which includes transcripts, furnished to the Court by the defendants, of recorded conversations which occurred during the investigation) that the alleged coaching, considered together with the other circumstances which defendants contend in the aggregate make out a due process violation, "constitutes the sort of outrageous imposition upon an individual that might exceed a due process test of constitutional fairness." *United States v. Williams*, 705 F.2d 603, 621 (2d Cir.1983). The encouragement of discussions about false end user certificates appears to have been an attempt on the part of the agents involved to put the terms of the contemplated transactions out into the open. This not a case in which the actions of the undercovers could be characterized as the "persistent exploitation of personal weakness" in order

to induce the commission of a crime. *Williams*, 705 F.2d at 620.

The size of the economic inducements offered to the defendants here does not alter the conclusion that the investigation satisfied constitutional requirements. Though the participants stood to gain large sums of money from their participation in the criminal ventures, the inducements offered were economic in kind. The scale of those inducements does not warrant the conclusion that an "unconscionable pressure" to participate was brought to bear on the defendants. *Williams*, 705 F.2d at 620. We note in this connection that defendant Evans, the intermediary who allegedly brokered all of the transactions, is an individual with experience in international corporate transactions. In addition, it appears here that the defendants knowingly elected to participate in high stakes deals.

Finally, we do not find merit in the claim that the Government needlessly and prematurely terminated the investigation when events were at an ambiguous state. When the investigation was terminated, it appears that the terms of two of the transactions, the so-called B.I.T. and Dergo transactions (Counts One and Two), were essentially agreed upon. When defendant Evans traveled to Bermuda, he carried with him contracts which allegedly memorialized the terms of those transactions. Furthermore, the next stage in the B.I.T. transaction was to be the opening up by the Government of an irrevocable letter of credit with a New York bank. Termination of the investigation at that stage was not inappropriate. We note in this connection that subsequent to the filing of defendants' submissions relating to the termination of the investigation, a fourth superseding indictment, containing substantive counts against certain

defendants, was returned. *See* footnote 1, *supra.*

In addition to the four areas of alleged governmental misconduct discussed above, the defense relies on several other instances of alleged misconduct as described in supplemental moving papers submitted as information began to surface in the so-called Iran affair.[3] The supplemental due process arguments may be briefly summarized. First, the defense argues that the United States simultaneously and unfairly encouraged brokers to negotiate arms deals with Iranians and created a "sting" operation to ensnare those so encouraged. Second, the defense contends that if high officials acting for the United States Government submitted false documents in connection with Iranian arms sales, the defendants may not then be fairly prosecuted for conspiring to do the same. Third, the defendants claim that in the course of pretrial discovery in these proceedings, relevant agencies unlawfully withheld information pertinent to the policy of the United States with respect to arms sales to Iran.[4]

■ The existence of arms shipments to Iranian buyers approved by the President of the United States, and the involvement of other United States officials in sending arms to Iran does not render outrageous the Government's attempt to enforce the laws the defendants are alleged to have violated here. Similar observations apply with respect to the defendants' claim that it is an outrageous violation of the due process clause for some United States officials to submit false end user certificates as part of a covert foreign policy, while others prosecute private individuals for conspiring to submit certificates which are also false.

3. Transactions involving arms sales to Iran allegedly carried out by officials connected with the White House is the subject of inquiry by the Office of the Independent Counsel as well as the United States Congress. Earlier in these proceedings, the Court inquired of the Independent Counsel whether he would be assuming jurisdiction over the prosecution of this case. We were informed that he had decided not to take over this case. *See, e.g.,* Letter to the Court, Rudolph W. Giuliani (by AUSA Schofield) (Jan. 27, 1987).

4. In addition to the foregoing, the defendants advance other theories which they assert support dismissal of the indictment on due process grounds. For example, the defendants raise a number of issues concerning pre-indictment publicity and the manner in which jurisdiction was obtained. We discuss various of these issues separately below but note at this point that in considering the due process motions, we have weighed all of the defendants' claims in the aggregate.

Information relevant to the Iran affair is currently unfolding. However, it is difficult to conceive of a scenario in connection with those transactions which would give rise to the conclusion that the investigation of the transactions underlying the indictment in this case violated the defendants' due process rights. Certainly, the juxtaposition upon which the defendants rely is of no constitutional consequence. If it develops that there was official approval of other arms transactions—those to which the defendants compare the contemplated transactions underlying the indictment— then the defendants' comparison is inapposite. Here, there is no contention that approval was actually obtained.

Finally, with respect to the Government's polling of the relevant agencies during discovery, the defendants argue that material information was wrongfully withheld. Specifically, defendants argue that it is not possible that there were no documents responsive to a request for information which could form the basis of a conclusion that United States policy was not to prohibit the sale of arms to Iran. On this point, the Government has submitted affidavits of appropriate Government officials. These affidavits contain satisfactory explanations of the searches undertaken.

A concluding observation is in order with respect to the due process motions. As indicated, in order for a defendant to establish the existence of a due process violation, he must show that the Government's conduct of the investigation "was most egregious and reached the level of shocking the conscience." *Alexandro*, 675 F.2d at 40. Occasionally, the due process defense has succeeded. *See Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952); *see also Watts v. Indiana*, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949). In those cases, "the challenged conduct ranged from an invasion into the integrity of the body to an extraordinarily coercive interrogation." *Alexandro*, 675 F.2d at 40.

In this case, by contrast, it appears that the Government's essential role was to furnish an Iranian buyer ostensibly willing to engage in illegal transactions involving American-made weapons.[5]

### B. *Pre-Trial Publicity*

Defendants contend that the indictment should be dismissed on the basis of what they characterize as "highly prejudicial publicity generated by the prosecution prior to the indictment." Memorandum of Law in Support of Defendant Samuel Evans' Pre-Trial Motions (Excluding Discovery Motions) at 25. In particular, defendants focus on a press conference held by the United States Attorney for the Southern District of New York and the Commissioner of the United States Customs Service to announce arrests in this case. The defendants assert that the statements made at the pre-indictment press conference violate the defendants' constitutional right to an impartial grand jury and a fair trial, and resulted in a denial of due process of law. The relief defendants request is the dismissal of the indictment.

The principal cases which defendants cite to support dismissal based on the publicity are instances of prosecutorial misconduct in the presentment of a case to a grand jury. *See United States v. Samango*, 607 F.2d 877, 883 (9th Cir.1979) (indictment dismissed where prosecutor presented to grand jury a transcript of defendant's prior grand jury testimony in which prosecutor conveyed his belief in defendant's guilt and where such presentation "served no other purpose than calculated prejudice"); *see also United States v. Digrazia*, 213 F.Supp. 232, 235 (N.D.Ill.1963) (indictment dismissed where prosecutor posed inflammatory questions designed to discredit defendant who asserted Fifth Amendment privilege). Although defendants contend that the Government's pre-indictment press conference was designed to achieve the same result as the conduct of the prosecu-

---

**5.** Defendant Minardos seeks dismissal of the indictment based on the theory that "the government cannot offer any proof whatsoever of his intent to violate the law of the United States, and ... even assuming that some proof thereof can be presented by the government, the record discloses entrapment of such a nature as to permit the court to decide that issue pre-trial." Minardos Memorandum of Law at 1. The motion is denied without prejudice to renewal.

tion in the cited cases, the Second Circuit has held that "a criminal conviction appealed on grounds of adverse pre-indictment publicity will not be overturned unless the moving party can 'bear the heavy burden of demonstrating that he has suffered actual prejudice as a result of the publicity.'" *United States v. Burke,* 700 F.2d 70, 82 (2d Cir.), *cert. denied,* 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983), quoting *United States v. Myers,* 510 F.Supp. 323, 325–26 (E.D.N.Y.1980). No such showing has been made here, nor can we infer actual prejudice from the media coverage of the press conference. To our knowledge, there is no case in which an indictment has been dismissed prior to trial based on pre-indictment publicity.

■ We highlight that the relief which defendants seek is the dismissal of the indictment, a drastic sanction which the Second Circuit holds is reserved for "truly extreme cases" of Governmental misconduct. *United States v. Broward,* 594 F.2d 345, 351 (2d Cir.), *cert. denied,* 442 U.S. 941, 98 S.Ct. 2882, 61 L.Ed.2d 310 (1979). In the absence of any application other than dismissal of the indictment, defendant's motion is dismissed without prejudice to renewal if in the course of jury selection, it appears that the impact of the pre-trial publicity engendered by the Government (as distinguished from the pre-trial publicity initiated by defendants and their counsel) is such that a fair trial is not possible.

## MOTIONS FOR SUPPRESSION

Defendants urge on a number of grounds that physical evidence seized from them be suppressed.[6] The five defendants deported from Bermuda—Evans, the Eisenbergs, Northrup, and Bar'Am ("the Bermuda defendants")—argue that warrants for searches of their briefcases were unlawful as a result of two prior illegal searches. These defendants, joined by Moll and Kopka, also maintain that their briefcases were

detained for an impermissibly long period of time prior to the searches. For the following reasons, the motions to suppress are denied.

### A. *The Searches of the Bermuda Defendants' Briefcases*

The Bermuda defendants contend that evidence seized from their briefcases pursuant to warrants should be suppressed because the warrants were the fruit of two previous unlawful searches. The first of these searches occurred during defendants' incarceration in Bermuda during April and May of 1986. At that time, the Attorney General of Bermuda requested Customs Agent King and another individual to assist Bermuda, which had retained custody over the briefcases, in a search of defendants' luggage. Affidavit of Joseph F. King, sworn to June 3, 1986 ("King Aff.") at ¶¶ 4–6. Bermuda's stated purpose was to determine whether defendants were carrying any evidence or instrumentalities of crimes to be committed in Bermuda. *Id.*

The second search on May 28, 1986 was conducted by Agent King upon defendants' entry into the United States, following their deportation from Bermuda. During this "border search," Agent King examined the contents of the briefcases without seizing their contents. The next day, May 29, the Government obtained search warrants for the briefcases. Agent King's affidavit in support of the Government's application for the warrants stated that defendants traveled to Bermuda for the illegal purpose of finalizing arms sales to Iran, and that during the border search, King observed specified documents contained in the briefcases pertaining to armaments.

■ We reject defendants' arguments that United States agents participated in an illegal search in Bermuda, thereby tainting the subsequent search warrants. The Government is correct that the critical is-

---

**6.** Kopka and Bihn also move to suppress post-arrest statements on the grounds that they were made during a period of unnecessary delay and were involuntary. As the "Government does not intend to introduce the statement[s] of Kopka or Bihn in the Government's case in chief at trial," Government's Memorandum of Law in Opposition to Defendants' Motions to Suppress Statements, Physical Evidence and Tapes, at 4, we need not reach defendants' contentions in this regard.

sue is whether the Government used the fruits of a prior illegal search to obtain the search warrants, thereby tainting searches made pursuant to warrant. *See United States v. Smith*, 730 F.2d 1052, 1056 (6th Cir.1984) and cases cited therein (unless tainted information was so important that probable cause did not exist without it, suppression not required); *United States v. Lace*, 502 F.Supp. 1021, 1039 (D.Vt.), *aff'd*, 669 F.2d 46 (2d Cir.), *cert. denied*, 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982). We find that the search performed in Bermuda played no part in the magistrate's decision to issue search warrants.

The search in Bermuda was nowhere mentioned in the affidavits submitted to the magistrate in support of the Government's application for the warrants. It is clear that the magistrate relied instead on the substance of the affidavits submitted by Agent King. In accordance with these affidavits, the magistrate correctly determined that probable cause existed. The magistrate issued the warrants based solely on the circumstances of defendants' travel to Bermuda and the evidence obtained from Agent King's border search. The fruits of the Bermudian search—the validity of which we do not reach—were not necessary to the magistrate's decision to issue the warrants based on probable cause. *See United States v. Giordano*, 416 U.S. 505, 554–56, 94 S.Ct. 1820, 1845–46, 40 L.Ed.2d 341 (1974) (Powell, J. concurring and dissenting) (stating independent source rule in context of a search warrant); *cf. Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978) (no hearing required if probable cause exists once false material in affidavit is set aside). In this connection, we reject defendants' contention that the failure to inform the magistrate of the Bermudian search was a deliberate attempt to conceal or somehow mislead the magistrate, or was in reckless disregard of the truth. *See Franks*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667; *United States v. Pond*, 523 F.2d 210 (2d Cir.1975), *cert. denied*, 423 U.S. 1058, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976).

The only pertinent issue, therefore, is whether the evidence produced from the border search, which was relied on by the magistrate, somehow tainted the search warrants that issued. It clearly did not. The "longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless 'reasonable' has a history as old as the Fourth Amendment itself." *United States v. Ramsey*, 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977). Such border searches are "considered to be 'reasonable' from the single fact that the person or item in question had entered into our country from the outside." *Id.; see also, e.g., United States v. Nieves*, 609 F.2d 642, 645–46 (2d Cir.1979), *cert. denied*, 444 U.S. 1085, 100 S.Ct. 1044, 62 L.Ed.2d 771 (1980); *United States v. Sugrim*, 732 F.2d 25, 29 (2d Cir.1984).

We reject defendants' contention that the border search was nonetheless impermissible because the agent performing the search had, at least in part, law enforcement objectives. Defendants rely for their argument on *United States v. Soto-Soto*, 598 F.2d 545 (9th Cir.1979). In that case, the Ninth Circuit held that evidence obtained in a border search had to be suppressed where the search was conducted by an FBI agent in the course of general law enforcement. The court held that border searches, which do not necessitate a warrant or probable cause, must be conducted by a customs or immigration officer acting in furtherance of the customs laws.

*Soto-Soto* is distinguishable from this case. Here, Agent King, unlike the FBI agent in *Soto-Soto*, was employed as a statutorily authorized Customs Service Agent. We hold that under the circumstances of defendants' detention in, and deportation from Bermuda, Agent King had ample authority under 19 U.S.C. § 482 to conduct a border search of defendants' briefcases in order to "control[ ] the movement of people and goods" across United States boundaries. *Nieves*, 609 F.2d at 645. We also find meritless defendants' argument that the briefcases were not defendants' belongings because they had been placed not by defendants, but by Ber-

mudian authorities, on the plane carrying defendants into the United States. *Cf. United States v. Muench*, 694 F.2d 28, 33–34 (2d Cir.1982), *cert. denied*, 461 U.S. 908, 103 S.Ct. 1881, 76 L.Ed.2d 811 (1983) (once defendants came within territorial jurisdiction of United States, the circumstances of "their passage in and out of the country, were entirely immaterial").

B. *Retention of Defendants' Briefcases*

 Defendants' claim that their briefcases were retained for an impermissibly long period of time following their arrest is also unpersuasive. The Government seized defendants' briefcases, and Bermudian authorities relinquished control, only upon defendants' entry into the United States. Following Agent King's border search, the Government had probable cause to believe the briefcases contained evidence pertaining to illegal arms sales. Therefore, the Government acted within constitutional boundaries when it obtained warrants a day later and searched the briefcases within the time constraints expressly imposed by the warrants. *See United States v. Place*, 462 U.S. 696, 701, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983) (where law enforcement authorities have probable cause to believe container holds evidence of crime, government may seize property pending issuance of search warrant).

We have examined defendants' remaining contentions in support of their motions for suppression and find them meritless. The motions are therefore denied.

## CONCLUSION

Except for the matters explicitly reserved, *see supra*, at 978, this Opinion decides all of the outstanding motions in this case. The Court has specifically addressed in this Opinion those issues which we believe warrant discussion but we note for purposes of clarity that all of the motions not explicitly reserved are denied.

SO ORDERED.